John R. Parker, Jr. (SBN 257761)
jrparker@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
3550 Watt Avenue, Suite 140
Sacramento, California 95608
Tel: (916) 616-2936

**MIGLIACCIO & RATHOD LLP**
Nicholas Migliaccio (*pro hac vice* anticipated)
Jason Rathod (*pro hac vice* anticipated)
Bryan G. Faubus (*pro hac vice* anticipated)
412 H St. NE
Washington, DC 20002
Tel: (202) 470-3520
Fax: (202) 800-2730
nmigliaccio@classlawdc.com
jrathod@classlawdc.com
bfaubus@classlawdc.com

*Attorneys for Plaintiff and Proposed Class*

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S. N., individually and on behalf of all others similarly situated,<br><br>Plaintiff ,<br><br>v.<br><br>BRIGHT HEART HEALTH, INC., d/b/a BRIGHT HEART HEALTH, a California Professional Corporation,<br><br>Defendant. | **Case No.**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff S. N. ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, hereby brings the following class action lawsuit against Defendant Bright Heart Health, Inc., d/b/a Bright Heart Health, a California Professional Corporation ("Bright Heart" or "Defendant").

Plaintiff's allegations are based upon personal knowledge as to herself and her own acts, and

1    upon information and belief as to all other matters based on the investigation conducted by and through

2    Plaintiff's attorneys. Plaintiff believes that substantial additional evidentiary support will exist for the

3    allegations set forth herein, after a reasonable opportunity for discovery.

4    **INTRODUCTION**

5    1.    Bright Heart is a corporation incorporated in California and headquartered in Walnut

6    Creek, Contra Costa County, California.  Bright Heart provides telemedicine and related services

7    online for a variety of highly sensitive medical conditions such as substance use disorders. Defendant

8    touts its mission "to provide expert care and support to all individuals struggling through

9    telemedicine."[1] Bright Heart offers services and treatment for a variety of health issues, including for

10    addiction, pain, and eating disorders. Defendant also offers mental health and telemedicine services,

11    support groups, and therapies, and issues prescriptions for extremely sensitive medical conditions.[2]

12    2.    This case arises from Defendant's systematic violation of the medical privacy rights of

13    its patients via exposing their highly sensitive personal information without those patients' knowledge

14    or consent, by Defendant's use of various third-party tracking and collection tools.

15    3.    Defendant    owns,    controls,    and    maintains    the    website

16    https://www.brighthearthealth.com/ (referred to herein as the "Website" or "Defendant's Website").

17    Defendant's Website states that its "telemedicine service provides expert professionals to men and

18    women through 2-way video conferencing on your phone, tablet, or computer."[3] In addition to pairing

19    patients and medical professionals together, Defendant provides services for substance abuse, opioid,

20    and eating disorders, including mental health and telepsychiatry, support groups, medications and

21    various therapies.

22    4.    Upon information and good faith belief, Defendant also owns, controls and operates a

23    a patient portal, which patients can access after they ask to sign up for Defendant's services (the

24    "Portal" and collectively with Website, "Web Properties").

25    5.    In order to use Defendant's Website, create patient accounts with Defendant, and/or

26    _____

27    [1] *Id.*

[2] https://www.brighthearthealth.com/services/rapid-access-opioid-use-disorder-treatment/

28    [3] *See* https://www.brighthearthealth.com/ (last visited Dec. 6, 2023).

utilize Defendant's services, individuals are required to share highly sensitive Private Information through Defendant's Website, including submitting personal health screenings that require the disclosure of highly sensitive health-related matters.

6.    Unbeknownst to users of Defendant's Website, Defendant installed and implemented "pixels" and similar tracking technologies on the Website to acquire and disclose the highly valuable Private Information of their users, customers, and patients to third parties such as Meta Platforms, Inc. d/b/a Facebook ("Meta" or "Facebook") and Google LLC ("Google").

7.    Invisible to the naked eye, pixels—which are configured by the website owner, here, Bright Heart—collect and transmit information from Users' browsers to unauthorized third parties.

8.    For instance, the Meta Pixel is a piece of code developed and licensed to website owners by Facebook ("Meta Pixel" or "Pixel") that "tracks the people and [the] type of actions they take"[4] as they interact with a website including how long a person spends on a particular web page, which buttons the person clicks, which pages they view and the text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box), among many other things.

9.    Defendant has utilized Meta Pixel and other tracking technologies on the Website since at least January 2017.

10.    While Plaintiff cannot, without the benefit of discovery, establish whether Defendant installed third party tracking codes inside its patient portal, upon information and good faith belief Defendant had captured and disclosed patients' Private Information communicated in its presumptively confidential and private patient portal as well.

11.    Defendant has disregarded the privacy rights of its patients who used its Web Properties ("Users" or "Class Members") by intentionally, willfully, recklessly and/or negligently failing to implement adequate and reasonable measures to ensure that the Users' personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information") was safeguarded. Instead, Defendant allowed unauthorized third parties such as Facebook and/or Google

---

[4] *Retargeting*,  https://www.facebook.com/business/goals/retargeting (last visited Mar. 5, 2024).

to intercept the content of its Users' communications on Defendant's Web Properties.

***Defendant Intercepted and Disclosed to Meta Plaintiff's and Class Members' Private Information in Violation of HIPAA and State, Federal and Common Law***

12.     Unbeknownst to Users and without Users' authorization or informed consent, Defendant installed the Meta Pixel and other invisible third-party tracking technology including Google Analytics, on its Web Properties in order to intercept Users' PII and PHI with the express purpose of disclosing that Private Information to third parties such as Meta and/or Google in violation of HIPAA Privacy Rule and 42 U.S.C. § 1320d-6 as well as state, federal and common law.

13.     Meta then improperly views and accesses the Private Information so that it can associate that information with the individual User whose information was disclosed and create targeted advertising that it sends to that User's personal Facebook account.

14.     Meta is able to personally identify each User with an active Facebook account by using the "c_user" cookie that Meta stores in users' browsers and which reveals a Facebook account-holder's unique "FID" value. A user's FID is linked to their Facebook profile, which personally identifies the user through a wide range of demographic and other information about the user, including the user's name, pictures, personal interests, work history, relationship status, and other details. Because the user's FID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person— can easily use the FID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

15.     However, the Pixel collects data regardless of whether the Website visitor has a Facebook account. In fact, Facebook maintains "shadow profiles" on users without Facebook accounts and links the information collected via the Pixel to the user's real-world identity using their shadow profile.

16.     The screenshots of Defendant's website, more fully explained *infra*, demonstrate how the Meta Pixel intercepts Users' Private Information, including the Private Information of Plaintiff and Class Members. Use of a tool called the "Meta Pixel Helper" and in-browser developer tools allows individuals to see some of the Private Information that Defendant is intercepting and disclosing to Facebook. The Meta Pixel helper is a tool Meta intended for its customers, like Defendant, to use

1  so that it could verify that the Pixel is working properly, troubleshoot common errors, and improve

2  Pixel performance.

3          17.     After downloading the Meta Pixel Helper, customers and others can right click and

4  "inspect" the performance of the Pixel to see what information Defendant is disclosing to Meta for

5  each webpage a User is visiting.

6          18.     The first screenshot below shows what a webpage from Defendant's Web Properties

7  looks like when you use in-browser developer tools to see how the Pixel works to disclose information

8  to Meta, **see Figure 1**:



21          19.     On the left-hand side of the screenshot is the page as it appears to any User visiting this

22  webpage. This is the result the User would see if they went to Defendant's webpage listing available

23  services and selected "opioid use disorder."

24          20.     The right-hand side of the screenshot is through the use of in-browser developer tools

25  to reveal what information Defendant is disclosing to Meta through the Pixel in the background and

26  unbeknownst to the User.

27          21.     Below is a larger image of the left hand of the screenshot above. Though it appears to

28  be code, a closer inspection makes it apparent that Defendant is disclosing both personally identifiable

1   information in the form of the c_user FID, which uniquely identifies an individual's Facebook account

2   (as well as other cookies that Facebook is known to utilize to identify individuals such as the datr and

3   fr cookies), as well as PHI that the User is sharing with Defendant when they use the Website.

4   ***Figure 2: Example of the Pixel's operation on the Website: an HTTP single communication session***

5   ***sent from the User's device to Facebook that reveals that the User is seeking a specific treatment***
    ***from Defendant for "opioid use disorder," along with the User's unique Facebook personal***

6   ***identifier (the c_user field) and other Facebook cookies unique to the User:***



20  22.    The highlighted portions reveal the information that Defendant is sharing with Meta.

21  Beginning at the top, the "id=538211229691443" is the unique ID number of the Pixel installed by

22  Defendant. Next to that is "PageView," a type of 'event' collected by the Pixel as the User navigates

23  the Website and which shares the exact URL of the page that the User is visiting.   Finally, on the top

24  line, Defendant is disclosing that the User is visiting "brighthearthealth.com."

25  23.    On the next line, Defendant is disclosing to Meta the PHI of the User. Here, Defendant

26  is disclosing that the User is seeking "services" from Defendant, and specifically the  "rapid access

27  opioid use disorder treatment" provided by Bright Heart.  Now Meta knows that the User is searching

28  for information related to the condition and treatment of opioid use disorder, personal health

information that is protected by HIPAA.

24.     The last highlighted lines, which begins with "cookie," contains the PII disclosed to Meta that allows Meta to specifically associate the PHI shared in the earlier lines with a specific individual.

25.     The first highlighted term is "datr" followed by a unique alphanumeric code. The "datr" cookie identifies the specific web browser from which the User is sending the communication. It is an identifier that is unique to the User's web browser and is therefore a means of identification for Meta. Meta keeps a record of every datr cookie identifier associated with each of its users.

26.     The highlighted "c_user" cookie followed by a number contains the unique Facebook User ID ("FID") for the person who is visiting this webpage. This user ID can be used to easily find the Facebook account of any user. If you have a person's FID (for example, FID 12345), all you have to do is add it to Facebook's root URL (www.facebook.com/) to find the user's profile.

27.     Finally, the "fr" cookie is a unique Facebook identifier that is an encrypted combination of the c_user and datr cookies, and is also used by Meta to identify individual users.

28.     In other words, with the use of the Pixel it installed on its Website, Defendant intercepts both the PII and the PHI of every User that visits every webpage, with the specific purpose of disclosing that HIPAA-protected health information to Meta.

29.     Meta, which created the Pixel aWend assigns a unique FID to each of its Facebook account holders, knows how to combine the information intercepted and shared by Defendant so that Meta can connect each user to the PHI that is disclosed. Meta does this in order to send targeted ads related to the medical conditions and treatments each user shares with Defendant to that user's personal Facebook account.

30.     The Pixel intercepts and discloses the information of every Facebook user that visits the Defendant's Web Properties in the same way. So when Plaintiff and Class Members visited Defendant's Web Properties, the URLs that describe the medical information on each page they visited, including their sensitive medical condition and treatment sought (for example: https://www.brighthearthealth.com/intake-forms/new-client-opioid-use-disorder)          were simultaneously shared with Meta during every interaction. And together with that PHI, Defendant's

Pixel (which relies on Facebook cookies to function) discloses to Meta the Facebook user ID of every person that visits its Web Properties so that Meta can personally identify that user and that user's PHI – including Plaintiff and every Class Member who visited Defendant's Website to research and share HIPAA-protected health information with Defendant while the Pixel was installed on the Web Properties.

31.     Plaintiff and Class Members who visited and used Defendant's Web Properties thought they were communicating with only their trusted healthcare providers, and reasonably believed that their sensitive and private PHI would be guarded with the utmost care. In browsing Defendant's Web Properties—be it to fill out intake forms for new patients, find sensitive information about their diagnosis, or investigate treatment for their diagnosis—Plaintiff and Class Members did not expect that extremely sensitive PHI such as health conditions and diagnoses (e.g., substance abuse, eating disorder), medical services sought (e.g., opioid use disorder treatment), patient status, or even their access/interactions on Defendant's online patient intake forms would be intercepted, captured and otherwise shared with Facebook and/or Google in order to target Plaintiff and Class Members with ads, in conscious disregard of their privacy rights.

32.     Plaintiff continued to have her privacy violated when her Private Information was used by Meta and Google to turn a profit by way of selling targeted advertising related to her respective medical conditions and treatments sought.

33.     Defendant knew that by embedding the Meta Pixel and Google Analytics on its Web Properties it was permitting Facebook to collect and use Plaintiff's and Class Members' Private Information, including sensitive medical information.

34.     Defendant (or any third parties) did not obtain Plaintiff's and Class Members' prior consent before sharing their sensitive, confidential communications with third parties such as Facebook or Google.

35.     Defendant's actions constitute an extreme invasion of Plaintiff's and Class Members' right to privacy and violate federal and state statutory and common law as well as Defendant's own Privacy Policies that affirmatively and unequivocally state that any personal information provided to Defendant will remain secure and protected.

36.     As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with medical providers online; (iii) emotional distress and heightened concerns related to the release of Private Information to third parties such as Meta; (iv) loss of the benefit of the bargain; (v) diminution of value of the Private Information; (vi) statutory damages and (vii) continued and ongoing risk to their Private Information. Plaintiff and Class Members have a substantial risk of future harm, and thus injury in fact, due to the continued and ongoing risk of misuse of their Private Information that was shared by Defendant with unauthorized third parties.

37.     Plaintiff seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and bring causes of action for: (1) negligence; (2) invasion of privacy, (3) breach of confidence; (4) unjust enrichment; (5) violations of the Electronics Communication Privacy Act ("ECPA"), 18 U.S.C. § 2511(1); (6) violations of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631; (7) violations of the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56, *et seq.*; (8) violations of the Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et seq.*; (9) violations of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*; (10) Larceny/Receipt of Stolen Property in violation Of California Penal Code § 496(a) and (c); (11) Breach of Fiduciary Duty; (12) violations of the Ohio Data Breach Statute, Ohio. Rev. Code Ann. § 1349.19 *et seq.*; and (13) violations of the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01 *et seq.*

## PARTIES

38.     Plaintiff S.N. is a citizen of the state of Ohio residing in Rockbridge and brings this action in an individual capacity and on behalf of all others similarly situated.

39.     Defendant Bright Heart Health, Inc. is a corporation incorporated in California and headquartered in Walnut Creek, Contra Costa County, California.

## JURISDICTION & VENUE

40.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C.

§ 2511. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

41.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative Class Members, and minimal diversity exists because Plaintiff and many putative Class Members are citizens of a different state than Defendant.

42.    This Court has personal jurisdiction over Defendant because it operates and maintains its principal place of business in this District. Further, Defendant is authorized to and regularly conduct business in this District and make decisions regarding corporate governance and management of the Website in this District, including decisions regarding the privacy of patients' PII and PHI and the incorporation of the Pixels and other tracking technologies.

43.    Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because: a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendant's governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiff's and Class Members' Private Information; Defendant's principal place of business is located in this District; Defendant collects and redistributes Class Members' Private Information in this District; and Defendant caused harm to Class Members residing in this District.

## PLAINTIFF S.N.'S EXPERIENCE

44.    Plaintiff has been a patient of Bright Heart since at least June 2022 and started using Defendant's Website around the same time or even earlier, in March 2022.

45.    Defendant encouraged Plaintiff to utilize Bright Heart's Web Properties to search for treatments and services, including online therapy for her diagnosis, and Defendant's locations for telehealth therapy; research her diagnosis; provide her medical history and PII; and make online appointments.

46.    While using Defendant's Web Properties, Plaintiff communicated sensitive—and what she expected to be confidential—personal and medical information to Defendant.

47.     On numerous occasions beginning in or around March or June 2022 and continuing as recently as August 2022, Plaintiff utilized Defendant's Web Properties on her personal electronic devices to research conditions and treatments, including for opioid use disorder, to fill out "new patient form" for "opioid use disorder" treatment, and create an account. In the process of using Defendant's services, Plaintiff was required to disclose highly sensitive PII and PHI to Defendant.

48.     Plaintiff also utilized Defendant's Web Properties for online therapy sessions, to communicate with her medical providers as well as to review her lab results.

49.     As a result of the Meta Pixel (and other invisible tracking codes) Defendant installed on its Web Properties, Plaintiff's sensitive Private Information was intercepted, viewed, analyzed and used by unauthorized third parties for commercial purposes.

50.     The full scope of Defendant's interceptions and disclosures of Plaintiff's communications to Meta can only be determined through formal discovery. However, Defendant intercepted at least the following communications about Plaintiff's patient status, treatments sought by Plaintiff, and locations sought, via the following long-URLs or substantially similar URLs that were sent to Meta via the Pixel:

- https://www.brighthearthealth.com/treatment-in-ohio/;
- https://www.brighthearthealth.com/services/rapid-access-opioid-use-disorder-treatment/;
- https://www.brighthearthealth.com/sud-support-group/;
- https:www.brighthearthealth.com/intake-forms/new-client-opioid-use-disorder;
- https://brighthearthealth.zoom.us/; and
- https://www.brighthearthealth.com/services/therapies/.

51.     Plaintiff reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by any third party without her full knowledge and informed consent.

52.     While Plaintiff was a user of Defendant's services, she never consented to or authorized the use of her Private Information by third parties or to Defendant enabling third parties to access, interpret, and use such Private Information.

53.    Plaintiff had a Facebook account while she used Defendant's services and she accessed Defendant's Website while logged into her Facebook account on the same devices she used to access Defendant's Web Properties.

54.    Immediately or shortly after providing her Private Information to Defendant through the Web Properties, Plaintiff began seeing targeted health ads related to the PHI she disclosed to Defendant as she scrolled through her accounts, such as ads for Suboxone—an opioid prescription drug used to treat opioid dependence.

55.    Defendant transmitted and/or enabled the transmission of Plaintiff's Private Information to Facebook without her knowledge, consent, or express written authorization. By failing to receive such requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

56.    Defendant did not inform Plaintiff that it shared her Private Information with Facebook or any other third party. Plaintiff only became aware of her claims in spring of 2023, upon consultation with counsel.

57.    But for Plaintiff's status as Defendant's patient and a user of Defendant's Web Properties and Defendant's express and implied promises regarding the security of her Private Information, Plaintiff would not have disclosed such information to Defendant.

58.    Plaintiff suffered damages in, inter alia, the form of (i) invasion of privacy; (ii) violation of confidentiality of her Private Information; (iii) loss of benefit of the bargain; (iv) diminution of value of the Private Information; (v) statutory damages and (vi) the continued and ongoing risk to her Private Information. Plaintiff has a continuing interest in ensuring that her Private Information is protected and safeguarded from future unauthorized disclosure.

## **FACTUAL BACKGROUND**

### ***Facebook's Problematic Use of Invisible Tracking Codes to Collect People's Data for its Advertising Business.***

59.    Meta operates the world's largest social media company. Its revenue is derived almost entirely from selling targeted advertising.

60.     The Meta Pixel and other third-party tracking tools also collect and transmit information from Defendant that identifies a Facebook user's status as a patient and other health information that is protected by federal and state law. This occurs through tools that Facebook encourages its healthcare Partners to use, including to upload patient lists to Facebook for use in its advertising systems.

61.     Meta associates the information it obtains via the Meta Pixel with other information regarding the User, using personal identifiers that are transmitted concurrently with other information the Pixel is configured to collect. For Facebook account holders, these identifiers include the "c_user" cookie IDs, which allow Meta to link data to a particular Facebook account. For both Facebook account holders and users who do not have a Facebook account, these identifiers also include cookies that Meta ties to their browser.

62.     Realizing the value of having direct access to millions of consumers, in 2007 Facebook began monetizing its platform by launching "Facebook Ads," proclaiming it to be a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads."[5]

63.     One of its most powerful advertising tools is Meta Pixel, formerly known as Facebook Pixel, which launched in 2015.

64.     Ad targeting has been extremely successful due, in large part, to Facebook's ability to target people at a granular level. "Among many possible target audiences, Facebook offers advertisers, [for example,] 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[6]

65.     The Meta Pixel is a free and publicly available "piece of code" that third-party web developers can install on their website to "measure, optimize and build audiences for ... ad

---

[5] *Facebook Unveils Facebook Ads* (November 6, 2007),
https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/.

[6] Natasha Singer, *What You Don't Know about How Facebook Uses Your Data* (April 11, 2018),
https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.

campaigns."[7]

66.    Meta describes the Pixel as "a snippet of JavaScript code" that "relies on Facebook cookies, which enable [Facebook] to match … website visitors to their respective Facebook User accounts.[8]

67.    Meta pushes advertisers to install the Meta Pixel. Meta tells advertisers the Pixel "can help you better understand the effectiveness of your advertising and the actions people take on your site, like visiting a page or adding an item to their cart."[9]

68.    Meta tells advertisers that the Meta Pixel will improve their Facebook advertising, including by allowing them to:

a.    "optimize the delivery of your ads" and "[e]nsure your ads reach the people most likely to take action;" and

b.    "create Custom Audiences from website visitors" and create "[d]ynamic ads [to] help you automatically show website visitors the products they viewed on your website—or related ones."[10]

69.    Meta explains that the Pixel "log[s] when someone takes an action on your website" such as "adding an item to their shopping cart or making a purchase," and the user's subsequent action:



Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website. Examples of actions include adding an item to their shopping cart or making a purchase. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. You'll also have options to reach those customers again through future Facebook ads.

---

[7] *Meta Pixel* (2023), https://www.facebook.com/business/tools/meta-pixel.

[8] *Meta Pixel* (2023), https://developers.facebook.com/docs/meta-pixel/.

[9] *Meta Pixel* (2023), https://www.facebook.com/business/tools/meta-pixel.

[10] *Id.*

70.     The Meta Pixel is customizable and web developers can choose the actions the Pixel will track and measure on a particular webpage.

71.     Meta advises web developers to place the Pixel early in the source code[11] for any given webpage or website to ensure that visitors will be tracked before they leave the webpage or website.[12]

72.     Meta's "Health" division is dedicated to marketing to and servicing Meta's healthcare "Partners."  Meta defines its "Partners" to include businesses that use Meta's products, including the Meta Pixel or Meta Audience Network tools to advertise, market, or support their products and services.

73.     Meta works with hundreds of Meta healthcare Partners, using Meta Collection Tools to learn about visitors to their websites and leverage that information to sell targeted advertising based on patients' online behavior. Meta's healthcare Partners also use Meta's other ad targeting tools, including tools that involve uploading patient lists to Meta.

74.     Healthcare providers like Defendant encourage Plaintiff and Class Members to access and use various digital tools via its Web Properties to, among other things, receive healthcare services, in order to gain additional insights into its Users, improve its return on marketing dollars and, ultimately, increase its revenue.

75.     In exchange for installing the Pixels, Facebook provided Defendant with analytics about the advertisements it has placed as well as tools to target people who have visited its Web Properties.

76.     Upon information and belief, Defendant and other companies utilized Plaintiff's and Class Members' sensitive information and data collected by the Meta Pixels on Defendant's Web Properties in order to advertise to these individuals later on Meta's social platforms.

---

[11] Source code is a collection of instructions (readable by humans) that programmers write using computer programming languages such as JavaScript, PHP, and Python. When the programmer writes a set or line of source code, it is implemented into an application, website, or another computer program. Then, that code can provide instructions to the website on how to function. *What is Source Code & Why Is It Important?* (July 19, 2023), https://blog.hubspot.com/website/what-is-source-code (last visited Mar. 13, 2024).

[12] *Meta Pixel: Get Started* (2023), https://developers.facebook.com/docs/meta-pixel/get-started.

77.     If a healthcare provider, such as Defendant, installs the Meta Pixel code as Meta recommends, patients' actions on the provider's website are contemporaneously redirected to Meta. For example, when a new patient clicks a button to register for an account by filling out an intake form, Meta's source code commands the patient's computing device to send the content of the patient's communication to Meta while the patient is communicating with Defendant. In other words, by design, Meta receives the content of a new patient's "registration" communication immediately when the patient clicks the "new patient intake form" button—even before the healthcare provider receives it.

78.     Thus, the Meta "pixel allows Facebook to be a silent third-party watching whatever you're doing,"[13] which in this case included the content of Defendant's patients' communications with its Web Properties, including their PHI.

79.     For Facebook, the Pixel acts as a conduit of information, sending the information it collects to Facebook through scripts running in the User's internet browser, via data packets labeled with PII, including the User's IP address, the Facebook "c_user" cookie and other third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.[14]

80.     A recent investigation by THE MARKUP revealed that the Meta Pixel was installed inside password-protected patient portals of at least seven U.S. health systems, giving Facebook access to even more patient communications with their providers.[15]

81.     David Holtzman, a health privacy consultant was "deeply troubled" by the results of THE MARKUP's investigation and indicated "it is quite likely a HIPAA violation" by the hospitals, such as Defendant.[16]

---

[13] Jefferson Graham, *Facebook spies on us but not by recording our calls. Here's how the social network knows everything* (March 4, 2020), https://www.usatoday.com/ story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/#.

[14] The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users. *See* Maciej Zawadziński & Michal Wlosik, *What Facebook's First-Party Cookie Means for AdTech* (June 8, 2022), https://clearcode.cc/blog/facebook-first-party-cookie-adtech/.

[15] *See* Feathers, *et al.*, *supra* note 4.

[16] *Id.*

82.    Facebook's access to use even only some of these data points—such as just a "descriptive" webpage URL—is problematic. As Laura Lazaro Cabrera, a legal officer at Privacy International, explained: "Think about what you can learn from a URL that says something about scheduling an abortion' . . . 'Facebook is in the business of developing algorithms. They know what sorts of information can act as a proxy for personal data."[17]

83.    The collection and use of this data raises serious concerns about user privacy and the potential misuse of personal information. For example, when Users browse Defendant's Web Properties, every step of their activity is tracked and monitored. By analyzing this data using algorithms and machine learning techniques, Facebook (and other entities tracking this information) can learn a chilling level of detail about Users' medical conditions, behavioral patterns, preferences, and interests.

84.    This data can be used not only to provide personalized and targeted content and advertising, but also for more nefarious purposes, such as tracking and surveillance. Moreover, the misuse of this data could potentially lead to the spread of false or misleading information, which could have serious consequences, particularly in the case of extremely sensitive medical information related to addiction and mental health captured and disclosed by Defendant.

85.    As pointed out by the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS), impermissible disclosures of such data in the healthcare context "may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI . . . . This tracking information could also be misused to promote misinformation, identity theft, stalking, and harassment."[18]

---

[17] Grace Oldham & Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, THE MARKUP (Sept. 25, 2022), https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients.

[18] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 12, 2024).

86.    Unfortunately, several recent reports detail the widespread use of third-party tracking technologies on hospitals', health care providers' and telehealth companies' digital properties to surreptitiously capture and to disclose their Users' Private Information.[19] Estimates are that over 664 hospital systems and providers utilize some form of tracking technology on their digital properties.[20]

***Google Also Uses Invisible Tracking Codes to Collect People's Data for its Advertising Business.***

87.    Alphabet Inc., the parent holding company of Google, generates revenues primarily by delivering targeted online advertising through Google, which is the creator of the Google Source Code and an established advertising company.

88.    Google Source Code—the source code associated with Google's advertising system and products, including Google Analytics—is designed to track and collect individuals' information when they are browsing the Internet.

89.    Google Analytics is associated with the domains www.Google-Analytics.com and analytics.google.com.

90.    Google Source Code is provided by Google in a copy-and-paste format, and its functionality is uniform on all web properties, with the option for website operators like Defendant to choose to disclose additional data about its users to Google. Its operation is hidden by Google's design and does not indicate to users that Google Source Code is present on a website they are visiting.

91.    When the Google Source Code is placed by website operators such as Defendant on its Website, Defendant's actions allow the Google Source Code to instruct the computer accessing Defendant's home page to track, intercept, and redirect the user's information to Google.

92.    This tracking, interception, and redirection of information occurs when individuals exchange communications or requests with the relevant websites.

---

[19] THE MARKUP reported that 33 of the largest 100 hospital systems in the country utilized the Meta Pixel to send Facebook a packet of data whenever a person clicked a button to schedule a doctor's appointment. Todd Feathers, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, *supra*, note 4.

[20] Dave Muoio & Annie Burky, *Advocate Aurora, WakeMed get served class action over Meta's alleged patient data mining,* FIERCE HEALTHCARE (November 4, 2022), https://www.fiercehealthcare.com/health-tech/report-third-top-hospitals-websites-collecting-patient-data-facebook.

93.     Google Analytics, a marketing tool used for advertising and analytics, is one of Google's primary products and services that leverage Google Source Code to track, collect, and subsequently use (i.e., monetize) individuals' personal information. A fundamental and primary purpose of Google Analytics is to obtain information about consumers' communications and activities that is accessible by entities other than Google. Google accomplishes this through Google Analytics, in part, by touting it as a tool that enables clients to "understand the customer journey and improve marketing ROI."[21] Specifically, according to Google, Google Analytics is intended to help advertisers:

a.  "Unlock customer-centric measurement" to "[u]nderstand how your customers interact across your sites and apps, throughout their entire lifecycle;"

b.  "Get smarter insights to improve ROI," to "[u]ncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data;" and

c.  "Connect your insights to results," to "[t]ake action to optimize marketing performance with integrations across Google's advertising and publisher tools[.]"[22]

94.     Like the Meta Pixel, when a user exchanges information with the host of a website—such as through a search query or clicking on a link—Google Source Code surreptitiously directs the user's browser to intercept and transmit a message to Google's servers containing the original GET Request sent to the host website, along with the POST Request that the Google Source Code is configured to collect. These transmissions are initiated by Google Source Code and concurrent with the communications to and from the host website.

95.     Google Analytics offers website developers like Defendant the option to include additional data of its own choosing about its users' activities in any communications to Google, including "Event Value" and "Event Label" data.  As can be seen from the Google Analytics developer website, this data is optional and not sent to Google by default.[23]

---

[21] Google Marketing Platform, *Analytics*, https://marketingplatform.google.com/about/analytics/.
[22] *Id.*
[23] Google Analytics, Measurement Protocol Parameter Reference, https://developers.google.com/analytics/devguides/collection/protocol/v1/parameters.

*Figure 3: Example of the Pixel's operation on the Website - an HTTP single communication session sent from the User's device to Google that reveals that the User is seeking specific services from Defendant for an "opioid use disorder":*



96.    Upon information and good faith belief, Defendant chose to disclose the actions its users took not only on the public-facing Website, but also inside its patient portal, to Google via Google Analytics by enabling the Google Analytics "Enhanced event measurement" feature.

97.    In other words, Defendant took affirmative, additional steps of its own to configure Google Analytics' tracking's ability to ensure that Google received additional data about its website users.

98.    As Meta does with the Meta Pixel, Google associates the information it obtains via Google Source Code with other information regarding the user, using personal identifiers that are transmitted concurrently with other information the code is configured to collect.

99.    These identifiers include the "cid," a combination of the time at which the user visited the website and a unique identifier. The "cid" is assigned to an individual's browser and can persist for up to two years, allowing Google to link a series of events to the same browser and, thus, to an individual. For Google account holders this identifier is also linked to that account. Defendant uses tracking tools such as Google Analytics and Google Tag Manager to track, intercept, and disclose Website users' sensitive communications with Defendant—including Private Information—to Google.

100.    In addition to information gleaned from a user's "cid," Google can create a unique, digital "fingerprint" for a user based on data transmitted via Google Source Code, which allows

Google to link certain web activity to a user. This "fingerprint" can consist of information regarding a user's screen depth, screen resolution, browser name and version, and operating system name and version, as well as a user's Internet Protocol ("IP") address. With that information, Google is able to link data acquired through Google Analytics to a particular user.

101. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[24]

102. Browser-fingerprints are also considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors. Browser-fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

103. After tracking, intercepting, and acquiring user's information, Google uses the information for personalized advertising in its advertising systems which includes, but is not limited to, Google Analytics.

104. For example, Google Analytics uses the information it collects to facilitate its Audience Targeting feature. Audience Targeting refers to serving ads to only a select number of users who share certain common characteristics. For Google's Audience Targeting, Google can target ads to either "Pre-defined Google Audiences" or "Advertiser-curated Audiences." Pre-defined Audiences are those created by Google based on interest and demographic data. Advertiser-curated Audiences are customized audiences created by Google through the use of the Source Code, including audiences created through Google Analytics.

105. Like Meta, Google is therefore able to—and, in fact, does—monetize the information surreptitiously intercepted, with Defendant's help, from visitors to the Defendant's Website including Plaintiff and Class Members.

106. Plaintiff had an active Google account during the relevant time period and Defendant disclosed her Private Information to Google for marketing purposes, without her consent.

***Defendant Disclosed Patient <u>Healthcare</u> Information, Including Patient Status, in Violation of the HIPAA Privacy Rule***

---

[24] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

107.    Healthcare entities collecting and disclosing Users' Private Information face significant legal exposure under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), which applies specifically to healthcare providers, health insurance providers and healthcare data clearinghouses.[25]

108.    The HIPAA privacy rule sets forth policies to protect all individually identifiable health information ("PII") that is held or transmitted.[26] This is information that can be used to identify, contact, or locate a single person or can be used with other sources to identify a single individual.

109.    Plaintiff's PII captured by the Pixel and sent to Meta included their unique personal identifiers such as their Facebook ID, IP address, device identifiers and browser "fingerprints."

110.    Defendant further violated the HIPAA Privacy Rule, among other statutory and common laws, because Plaintiff's PHI concerning her specific medical conditions such as an opioid addiction was disclosed to Meta and Google by the Pixel, Google Analytics and other third-party trackers embedded by Defendant on its Web Properties.

111.    HIPAA also protects against revealing an individual's status as a patient of a healthcare provider.[27]

112.    The only exception permitting a hospital to identify patient status without express written authorization is to "maintain a directory of individuals in its facility" that includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient. 45 C.F.R. § 164.510(2).

---

[25] *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[26] The HIPAA Privacy Rule protects all electronically protected health information a covered entity like Defendant "created, received, maintained, or transmitted" in electronic form. *See* 45 C.F.R. § 160.103.

[27] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Mar. 12, 2024).

113.    Defendant unlawfully revealed Plaintiff's and Class Members' patient status to Facebook, Google and likely other unauthorized third parties in violation of HIPAA when the Meta Pixel captured and disclosed Plaintiff's and Class Members' activity on patient-dedicated webpages of the Web Properties, such as new patient intake forms and, upon information and good faith belief, the Patient Portal.

### *HIPAA's Protections Do Not Exclude Internet Marketing*

114.    As the OCR reminded entities regulated under HIPAA in its recently issued *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* bulletin:

> Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[28]

115.    OCR makes it clear that information that is routinely collected by vendors on public-facing websites may be PHI, including unique identifiers such as IP addresses, device IDs, or email addresses.[29]

116.    HHS has also confirmed that healthcare providers violate HIPAA when they use tracking technologies that disclose an individual's identifying information (like an IP address) *even if no treatment information is included and even if the individual does not have a relationship with the healthcare provider*, when a regulated entity collects the individual's IIHI through its website or mobile app and the information connects the individual to the regulated entity (*i.e.* it is indicative that the individual has received or will receive healthcare services or benefits from the covered entity), the IIHI thus relates to the individual's past, present, or future health or healthcare or payment for care. For example:

> [I]f an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor,

---

[28] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, supra,* note 18.

[29] *See id.*; *see also* Mason Fitch, *HHS Bulletin Raises HIPAA Risks for Online Tracking Vendors*, LAW360 (December 13, 2022), https://www.law360.com/articles/1557792/hhs-bulletin-raises-hipaa-risks-for-online-tracking-vendors?copied=1.

the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care. [30]

117.    Further, HIPAA applies to healthcare providers' webpages with tracking technologies even outside the patient portal, i.e. to "unauthenticated" webpages because tracking technologies on unauthenticated webpages may access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to tracking technology vendors.

118.    Examples of unauthenticated webpages where the HIPAA Rules apply include pages where an individual can research treatment options, schedule appointments or use an online symptoms-checker tool, as well the login pages of a regulated entity's patient portal (which may be the website's homepage or a separate, dedicated login page), or a user registration webpage where an individual creates a login for the patient portal, which collect an individual's credentials such as their email address and/or name. In these examples, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.[31]

119.    As a result, a healthcare provider like Defendant may not disclose PHI to a tracking technology vendor, like Meta, unless it has properly notified its Website Users and entered into a business associate agreement with the vendor in question.

120.    Defendant disclosed Plaintiff's and Class Members' PHI without their consent and without a business associate agreement with Meta.

***Defendant Transmitted A Broad Spectrum of Plaintiff's & Class Members' Identifiable Health Information to Meta via the Meta Tracking Tools.***

121.    Every website is comprised of "Markup" and "Source Code." Markup consists of the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Web Properties.

---

[30] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, supra*, note 18.

[31] *Id.*

122.    Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source Code is designed to be readable by humans and formatted in a way that developers and other users can understand.

123.    In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions including the ability to command a website user's browser to send data transmissions to third parties like Facebook, via the Meta Pixel.[32]

124.    Defendant's Pixel, embedded in its JavaScript Source Code on the Web Properties, manipulates a User's browser by secretly instructing it to duplicate a User's communications (HTTP Requests) and sending those communications to Facebook.

125.    This occurs because the Pixel is programmed to automatically track and transmit Users' communications, and this occurs contemporaneously, invisibly, and without the Users' knowledge.

126.    Defendant's Source Code essentially commands a patient's browser to re-direct their actions on the Web Properties (characterized as "Event Data" by the Pixel), which contain PHI, through the HTTPS protocol to Meta at a Meta "endpoint," *i.e.*, a URL at a domain controlled by Meta that exists for the purpose of acquiring such information.

127.    The information Defendant sends to Meta from its use of the Meta Pixel and other tracking tools includes, but is not limited to, the following:

    a.   The exact search terms entered by a User on the Website, including searches for the User's medical symptoms and conditions, specific medical providers and their specialty, and treatments sought;

    b.   descriptive URLs that describe the categories of the Website, categories that describe the current section of the Website, and the referrer URL that caused navigation to the current page;

    c.   the communications a User exchanges through Defendant's Web Properties by clicking and viewing webpages, including communications about providers and specialists, conditions, and treatments, along with the timing of those communications, including, upon information and good faith belief, whether they are made while a User is still logged in to the Patient Portal or around

---

[32] These Pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware of them.

the same time that the User has scheduled an appointment, called the medical provider, or logged in or out of the Patient Portal;

d.  when a User sets up or schedules an appointment;

e.  information that a User clicks on in an appointment form;

f.  when a User clicks a button to call the provider from a mobile device directly from Defendant's Website;

g.  when a User clicks to register for the Patient Portal, clicks to log into the Portal, and/or accesses other patient-dedicated web pages; and

h.  the same or substantially similar communications that patients exchange with health insurance companies, pharmacies, and prescription drug companies.

128.  Thus, Defendant is, in essence, handing patients a tapped device and once one of its webpages is loaded into the User's browser, the software-based wiretap is quietly waiting for private communications on the webpage to trigger the tap, which intercepts those communications—intended only for Defendant—and transmits those communications to unauthorized third parties such as Facebook.

129.  For example, when a patient visits www.brighthearthealth.com and clicks on "Intake Forms," their browser automatically sends an HTTP request to Defendant's web server. Defendant's web server automatically returns an HTTP response, which loads the Markup for that particular webpage.

130.  The patient visiting this particular web page only sees the Markup, not the Defendant's source code or underlying HTTP Requests and Responses.

131.  In reality, Defendant's Source Code and underlying HTTP Requests and Responses share the patient's personal information with Facebook, including the fact that a User was looking for treatment for their heart disease, diabetes, or stroke diagnosis — along with the User's unique personal identifiers.

132.  Defendant begins tracking its users from the moment they land on the Website via a Meta Pixel (ID number 538211229691443). This Pixel is configured to capture "PageView" events as the user browses the website, researches treatments and support groups available for his/her specific medical condition, and fills out intake forms.

133.    The "PageView" event captures full-string URLs of pages visited on Defendant's Website. These URLs contain medical conditions users seek to treat as well as medical services sought, as well as other details, as shown in the images below

***Figures 4 & 5: An HTTP single communication session sent from the device to Facebook revealing that the User has viewed treatment options for sensitive medical conditions including chronic pain and opioid use disorder:***



**Figure 5:**



*Figure 6: Facebook also receives, through Pixels, information regarding whether the user is seeking an appointment.*



*Figure 7: When a user clicks on Bright Heart seeking treatment, Google receives what type of medical assistance the person is seeking, including eating disorders, substance abuse, and mental health treatment.*



1

2    *Figures 8-9: As a user completes the "Patient History Questionnaire," information is transferred*
3    *to Facebook and a session ID is created*

4

5

6

7

8

9

10

11

12

13

14    *Figure 9:*

15

16

17

18

19

20

21

22

23

24

25    134.    Similarly, Defendant shares with Facebook the fact that a particular user is looking

26    for highly sensitive treatments such as services for substance abuse, including even the fact that a

27    User is filling out an intake form for a "new patient" who is seeking a specific treatment for a

28    specific addiction or a sensitive diagnosis, all while simultaneously sharing the user's Facebook ID,

1    IP address and other personal identifiers.

2    *Figure 10: A screenshot demonstrating that the Pixel is sharing a User's (such as Plaintiff S.N.)*
3    *actions such as filling out the intake form to sign up as a patient for Defendant's treatment of*
     *opioid use disorder:*

4

5
6
7
8
9
10
11
12

13   *Figure 11: A screenshot from the same communication session as above demonstrating that the*
     *Pixel is sharing a User's (such as Plaintiff S.N.) actions as they fill out the intake form to sign up*
14   *as a patient for Defendant's treatment of opioid use disorder along with their unique personal*
15   *identifiers including the c_user FID:*

16

17
18
19
20
21
22
23
24
25
26
27

28   135.    The Pixels also share the user's identifying information for easy tracking via the

cookies stored on their computer by Facebook and/or Google. For example, Facebook stores or updates a Facebook-specific cookie every time a person accesses their Facebook account from the same web browser. The Meta Pixel can access this cookie and send certain identifying information like the user's Facebook ID to Facebook along with the other data relating to the user's Website inputs. The same is true for Google (and likely the other third parties receiving Defendant's patients' Private Information from their tracking codes on the Website), which also create cookies that are stored in the user's computer and accessed by the Pixels to identify the user.

136.    Defendant also deposits cookies named _fbp, _ga_, and _gid onto Plaintiff's and Class Members' computing devices. These are cookies associated with the third-parties Facebook and Google deposited by Defendant on Plaintiff's and Class Members' computing devices by disguising them as first-party cookies. And without any action or authorization, Defendant commands Plaintiff's and Class Members' computing devices to contemporaneously re-direct the Plaintiff's and Class Members' identifiers and the content of their communications to Facebook and Google.

137.    The fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Meta Pixel. The fbp cookie emanates from Defendant's Website as a putative first-party cookie, but is transmitted to Facebook through cookie syncing technology that hacks around the same-origin policy. The __ga and _gid cookies operate similarly as to Google.

138.    Furthermore, if the patient is also a Facebook user, the information Facebook receives is linked to the patient's Facebook profile (via their Facebook ID or "c_user id"), which includes other identifying information.

***Defendant's Web Properties Sent Plaintiff's and Class Members' PHI to Facebook Along with Unique Personal Identifiers.***

139.    As described herein, Defendant's Meta Pixel (and other third-party trackers) sent sensitive Private Information to Facebook, including but not limited to Plaintiff's and Class Members': (i) status as medical patients; (ii) health conditions; (iii) sought treatments or therapies; and (iv) web pages viewed.

140.    Importantly, the Private Information Defendant's Pixel sent to Facebook was sent alongside Plaintiff's and Class Members' personal identifiers, including their IP addresses and cookie values such as their unique Facebook ID, thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts.

141.    Through the source code deployed by Defendant, the cookies that it uses to help Facebook identify patients include but are not necessarily limited to cookies named: "c_user," "datr," "fr," and "fbp."

142.    A User's FID is linked to their Facebook profile, which generally contains a wide range of demographics and other information about the User, including pictures, personal interests, work history, relationship status, and other details. Because the User's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the User's corresponding Facebook profile.

143.    The "datr" cookie identifies the patient's specific web browser from which the patient is sending the communication. It is an identifier that is unique to the patient's specific web browser and is therefore a means of identification for Facebook users.

144.    The "fr" cookie is a Facebook identifier that is an encrypted combination of the c_user and datr cookies.[33] Facebook, at a minimum, uses the fr cookie to identify Users.[34]

145.    At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a User:[35]

---

[33] *See* Gunes Acar et al., *Facebook Tracking Through Social Plug-ins: Technical Report prepared for the Belgian Privacy Commission* 16 (March 27, 2015), https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf.

[34] *Cookies Policy*, https://www.facebook.com/policy/cookies/ (last visited Mar. 12, 2024).

[35] *Id*.

146.    The fr cookie expires after ninety (90) days unless the User's browser logs back into Facebook.[36] If that happens, the time resets, and another ninety (90) days begins to accrue.

147.    The _fbp cookie expires after ninety (90) days unless the User's browser accesses the same website.[37] If that happens, the time resets, and another ninety (90) days begins to accrue.

148.    The Facebook Meta Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—i.e., Defendant.[38]

149.    A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook.[39]

150.    The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

151.    Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to FIDs and corresponding Facebook profiles.

152.    As shown in the figures above, Defendant sent these identifiers with the event data.

153.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information, nor did they authorize any assistance with intercepting their communications.

154.    Plaintiff was never provided with any written notice that Defendant disclosed its Website Users' Private Information nor were they provided any means of opting out of such disclosures.

155.    Despite this, Defendant knowingly and intentionally disclosed Plaintiff's Private Information to Facebook.

---

[36] *Id.*

[37] *Id.*

[38] This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[39] This is confirmable by tracking network activity.

156.    Defendant breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Private Information to Meta and Google. Specifically, Plaintiff and Class Members had a reasonable expectation of privacy based on Defendant's own representations to Plaintiff and the Class that Defendant would not disclose their Private Information to third parties.

***Defendant Violates Its Promises to Users and Patients to Protect Their Confidentiality.***

157.    Defendant did not inform Plaintiff that it shared her Private Information with Facebook or Google. Defendant's Privacy Policy did not state that user and patient Private Information will be shared with Facebook or other unauthorized third parties. Indeed, Defendant displays the following in its "About" page, in a tab entitled, "Privacy":

> For those countless individuals who shy away from treatment in a public space due to stigma, shame, or fear, Bright Heart is the most private option possible. Individuals can join from the safety of their own home without the worry of someone knowing they are in treatment.[40]

158.    By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant violated its own Privacy Policy and breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Private Information.

159.    As a "redundant" measure to ensure Plaintiff's and Class Members' Private Information was successfully transmitted to third parties like Facebook, Defendant also implemented server-based workarounds like Conversions API to send Plaintiff's and Class Members' Private Information from electronic storage on Defendant's server directly to Facebook, at a minimum.

160.    Even non-Facebook users can be individually identified via the information gathered on the Digital Platforms, like an IP address or personal device identifying information. This is precisely the type of information for which HIPAA requires the use of de-identification techniques to protect patient privacy.[41]

161.    In fact, in an action currently pending against Facebook related to use of their Pixel on healthcare provider web properties, Facebook explicitly stated it requires Pixel users to "post a

---

[40] https://www.brighthearthealth.com/about/ (last visited Mar. 5, 2024).

[41] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the HIPAA Privacy Rule, supra,* note 23.

prominent notice on every page where the Pixel is embedded and to link from that notice to information about exactly how the Pixel works and what is being collected through it, so it is not invisible."[42] Defendant did not post such a notice.

162.    Facebook further stated that "most providers [...] will not be sending [patient information] to Meta because it violates Meta's contracts for them to be doing that."[43]

163.    Despite a lack of disclosure, Defendant allowed third parties to "listen in" on patients' confidential communications and to intercept and use for advertising purposes the very information it promised to keep private, in order to bolster its profits.

***Plaintiff and Class Members Reasonably Believed That Their Confidential Medical Information Would Not Be Shared with Third Parties.***

164.    Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

165.    Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

166.    Personal data privacy and obtaining consent to share Private Information are material to Plaintiff and Class Members.

167.    Plaintiff and Class Members relied to their detriment on Defendant's uniform representations and omissions regarding protection privacy, limited uses, and lack of sharing of their Private Information.

168.    Now that their sensitive personal and medical information is in possession of third parties, Plaintiff and Class Members face a constant threat of continued harm including bombardment of targeted advertisements based on the unauthorized disclosure of their personal data. Collection and

---

[42] *See* Transcript of the argument on Plaintiff's Motion for Preliminary Injunction in *In re Meta Pixel Healthcare Litig.*, Case No. CV-22-03580-WHO (N.D. Cal. Nov. 9, 2022) (Hon. J. Orrick), at 19:12-18; *see also In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218 (N.D. Cal. Dec 22, 2022).

[43] *Id.* at 7:20-8:11.

sharing of such sensitive information without consent or notice poses a great threat to individuals by subjecting them to the never-ending threat of identity theft, fraud, phishing scams, and harassment.

***Plaintiff and Class Members Have No Way of Determining Widespread Usage of Invisible Pixels.***

169.    Plaintiff and Class Members did not realize that tracking Pixels exist because they are invisibly embedded within Defendant's Web Properties.[44] Patients and Users of Defendant's Web Properties do not receive any alerts during their uses of Defendant's Web Properties stating that Defendant tracks and shares sensitive medical data with Facebook, allowing Facebook and other third parties to subsequently target all users of Defendant's website for marketing purposes.

170.    Plaintiff and Class Members trusted Defendant's Web Properties when inputting sensitive and valuable Private Information. Had Defendant disclosed to Plaintiff and Class Members that every click, every search, and every input of sensitive information was being tracked, recorded, collected, and ***disclosed*** to third parties, Plaintiff and Class Members would not have trusted Defendant's Web Properties to input such sensitive information.

171.    Defendant knew or should have known that Plaintiff and Class Members would reasonably rely on and trust Defendant's promises regarding the tracking privacy and uses of their Private Information. Furthermore, any person visiting a health website has a reasonable understanding that medical providers must adhere to strict confidentiality protocols and are bound not to share any medical information without their consent.

172.    By collecting and sharing Users' Private Information with Facebook and other unauthorized third parties, Defendant caused harm to Plaintiff, Class Members, and all affected individuals.

173.    Furthermore, once Private Information is shared with Facebook, such information may not be effectively removed, even though it includes personal and private information.

174.    Plaintiff fell victim to Defendant's unlawful collection and sharing of their sensitive medical information using the Meta Pixel tracking code on Defendant's Web Properties.

---

[44] *See, e.g.*, FTC Office of Technology, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking* (March 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking.

***Defendant Knew Plaintiff's Private Information Included Sensitive Medical Information,***
***Including Medical Records.***

175.    By virtue of how the Meta Pixel works, i.e., sending all interactions on a website to Facebook, Defendant was aware that its Users' Private Information would be sent to Facebook when they researched specific medical conditions and/or treatments, looked up providers, made appointments, typed specific medical queries into the search bar, and otherwise interacted with Defendant's Web Properties.

176.    At all times relevant herein Meta notified its partners, including Defendant, to have the rights to collect, use, and share user data before providing any data to Meta.[45] Although Meta's intent is questionable, Defendant had been on notice of this Pixel-tracking ever since it activated such Pixel technology on its Web Properties.

> **Information from partners.**
> Advertisers, app developers, and publishers can send us information through Meta Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel. These partners provide information about your activities off of our Products—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services —whether or not you have an account or are logged into our Products. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information.
>
> Partners receive your data when you visit or use their services or through third parties they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us. Learn more about the types of partners we receive data from.
>
> To learn more about how we use cookies in connection with Meta Business Tools, review the Facebook Cookies Policy and Instagram Cookies Policy.

---

[45] *See In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580-WHO, 2022 U.S. Dist. LEXIS 230754, at *13-14 (N.D. Cal. Dec. 22, 2022)

177.    Meta changed this provision again in July 2022, while still requiring partners to have the right to share patient information with Meta:[46]



How do we collect or receive this information from partners?

Partners use our Business Tools, integrations and Meta Audience Network technologies to share information with us.

These Partners collect your information when you visit their site or app or use their services, or through other businesses or organizations they work with. We require Partners to have the right to collect, use and share your information before giving it to us.

178.    Defendant had the explicit option to disable the Pixel technology on its Web Properties, but chose not to exercise this option, thereby continuing to share data with Facebook despite the availability of preventive measures.

179.    Meta advised third party entities, like Defendant, to refrain from sending any information it did not have the legal right to send and expressly emphasized not to transmit health information. Yet, Defendant, in direct contravention of these disclosures, and more importantly despite Defendant's promises to keep all health-related data about patients confidential, continued to employ Pixel tracking on its Web Properties, thereby sharing sensitive patient data without proper authorization or consent.

***Plaintiff and Class Members Have a Reasonable Expectation of Privacy in Their Private Information, Especially with Respect to Sensitive Medical Information.***

180.    Plaintiff and Class Members have a reasonable expectation of privacy in their Private Information, including personal information and sensitive medical information.

181.    HIPAA sets national standards for safeguarding protected health information. For example, HIPAA limits the permissible uses of health information and prohibits the disclosure of this information without explicit authorization. *See* 45 C.F.R. § 164. HIPAA also requires that covered entities implement appropriate safeguards to protect this information. *See* 45 C.F.R. § 164.530(c)(1).

---

[46] Meta, *Data Policy: Information from Partners, vendors and third parties* (Jan. 1, 2023), https://www.facebook.com/privacy/policy?subpage=1.subpage.4-InformationFromPartnersVendors.

182.    This federal legal framework applies to health care providers, including Defendant.

183.    Given the application of HIPAA to the Defendant, Plaintiff and the members of the Class had a reasonable expectation of privacy over their PHI.

184.    Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the collection and unauthorized disclosure of sensitive medical information from millions of individuals, as Defendant have done here, violates expectations of privacy that have been established as general societal norms.

185.    Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

186.    For example, a recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[47] Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[48]

187.    Users act consistent with these preferences. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.[49]

188.    Medical data is particularly even more valuable because unlike other personal information, such as credit card numbers which can be quickly changed, medical data is static. This is

---

[47] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds* (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[48] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER (November 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[49] Margaret Taylor, *How Apple Screwed Facebook*, WIRED (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

why companies possessing medical information, like Defendant, are intended targets of cyber-criminals.[50]

189.    Patients using Defendant's Web Properties must be able to trust that the information they input including their physicians, their health conditions and courses of treatment will be protected. Indeed, numerous state and federal laws require this. And these laws are especially important when protecting individuals with particular medical conditions such as HIV or AIDS that can and do subject them to regular discrimination. Furthermore, millions of Americans keep their health information private because it can become the cause of ridicule and discrimination. For instance, despite the anti-discrimination laws, persons living with HIV/AIDS are routinely subject to discrimination in healthcare, employment, and housing.[51]

190.    The concern about sharing medical information is compounded by the reality that advertisers view this type of information as particularly high value. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one article put it: "the datafication of family life can begin from the moment in which a parent thinks about having a baby."[52] The article continues, "[c]hildren today are the very first generation of citizens to be datafied from before birth, and we cannot foresee — as yet — the social and political consequences of this historical transformation. What is particularly worrying about this process of datafication of children is that companies like . . . Facebook . . . are harnessing and collecting

---

[50] Caroline Humer & Jim Finkle, *Your medical record is worth more to hackers than your credit card*, REUTERS (September 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924.

[51] Bebe J. Anderson, JD, *HIV Stigma and Discrimination Persist, Even in Health Care*, AMA J. ETHICS (December 2009), https://journalofethics.ama-assn.org/article/hiv-stigma-and-discrimination-persist-even-health-care/2009-12.

[52] Veronica Barassi, *Tech Companies Are Profiling Us From Before Birth*, MIT PRESS READER (January 14, 2021), https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/.

multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[53]

191.    Other privacy law experts have expressed concerns about the disclosure to third parties of a users' sensitive medical information. For example, Dena Mendelsohn—the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs—explained that having your personal health information disseminated in ways you are unaware of could have serious repercussions, including affecting your ability to obtain life insurance and how much you pay for that coverage, increase the rate you are charged on loans, and leave you vulnerable to workplace discrimination.[54]

192.    Defendant surreptitiously collected and used Plaintiff's and Class Members' Private Information, including highly sensitive medical information, through Meta Pixel in violation of Plaintiff's and Class Members' privacy interests.

***Defendant Was Enriched & Benefitted from the Use of the Pixel & other Tracking Technologies that Enabled the Unauthorized Disclosures Alleged Herein.***

193.    Meta advertises its' Pixel as a piece of code "that can help you better understand the ***effectiveness of your advertising*** and the actions people take on your site, like visiting a page or adding an item to their cart. You'll also be able to see when customers took an action after seeing your ad on Facebook and Instagram, which can help you with retargeting. And when you use the Conversions API alongside the Pixel, it creates a more reliable connection that helps the delivery system ***decrease your costs***."[55]

194.    Retargeting is a form of online marketing that targets Users with ads based on previous internet communications and interactions. Retargeting operates through code and tracking pixels

---

[53] *Id.*

[54] *See* Class Action Complaint, *Jane Doe v. Regents of the Univ. of Cal. d/b/a UCSF Medical Center* (Feb. 9, 2023), https://www.classaction.org/media/doe-v-regents-of-the-university-of-california.pdf.

[55] *What is the Meta Pixel,* https://www.facebook.com/business/tools/meta-pixel (emphasis added) (last visited Mar. 5, 2024).

placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[56]

195.    The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Facebook via the tracking technologies and the Pixel embedded on, in this case, Defendant's Website.

196.    Through this process, the Meta Pixel loads and captures as much data as possible when a User loads a healthcare website that has installed the Pixel. The information the Pixel captures, "includes URL names of pages visited, and actions taken - all of which could be potential examples of health information."[57]

197.    In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook and likely other third parties in the form of enhanced advertising services and more cost-efficient marketing on its platform.

198.    But companies have started to warn about the potential HIPAA violations associated with using pixels and tracking technologies because many are not HIPAA-complaint or are only HIPAA-compliant if certain steps are taken.[58]

199.    For example, Freshpaint a healthcare marketing vendor, cautioned that "Meta isn't HIPAA-compliant", and "If you followed the Facebook (or other general) documentation to set up your ads and conversion tracking using the Meta Pixel, remove the Pixel now."[59]

200.    Medico Digital also warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."[60]

---

[56] *The complex world of healthcare retargeting,* https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting/ (last visited Mar. 5, 2024).

[57] *Id.*

[58] *See* PIWIK Pro, *The guide to HIPAA compliance in analytics,* https://campaign.piwik.pro/wp-content/uploads/2023/10/The-guide-to-HIPAA-compliance-in-analytics.pdf (explaining that Google Analytics 4 is not HIPAA-compliant) (last visited Mar. 5, 2024).

[59] *Id.*

[60] *The complex world of healthcare retargeting, supra*, note 56.

1    201.    Thus, utilizing the Pixels directly benefits Defendant by, among other things, reducing

2    the cost of advertising and retargeting.

3    ***Plaintiff's & Class Members' Private Information Has Substantial Value.***

4    202.    Plaintiff's and Class Members' Private Information had value, and Defendant's

5    disclosure and interception harmed Plaintiff and the Class by not compensating them for the value of

6    their Private Information and in turn decreasing the value of their Private Information.

7    203.    The value of personal data is well understood and generally accepted as a form of

8    currency. It is now incontrovertible that a robust market for this data undergirds the tech economy.

9    204.    The robust market for Internet user data has been analogized to the "oil" of the tech

10   industry.[61] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset

11   that allows companies to acquire or maintain a competitive edge."[62] That article noted that the value

12   of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

13   205.    Conservative estimates suggest that in 2018, Internet companies earned $202 per

14   American user from mining and selling data. That figure is only due to keep increasing; estimates for

15   2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

16   206.    This economic value has been leveraged largely by corporations who pioneered the

17   methods of its extraction, analysis and use. However, the data also has economic value to Internet

18   users. Market exchanges have sprung up where individual users like Plaintiff herein can sell or

19   monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for

20   their data.[63]

21   207.    Healthcare data is particularly valuable on the black market because it often contains

22   all of an individual's PII and medical conditions as opposed to a single piece of information that may

23   be found in a financial breach.

24

25   [61] *See The world's most valuable resource is no longer oil, but data*,
26   https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited Mar. 5, 2024).

27   [62] *See* https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited Mar. 5, 2024).

28   [63] *See 10 Apps for Seling Your Data for* Cash, https://wallethacks.com/apps-for-selling-your-data/ (last visited Mar. 5, 2024).

208.    In 2023, the Value Examiner published a report that focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[64]

209.    In 2021, Trustwave Global Security published a report entitled *Hackers, breaches and the value of healthcare data*. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[65]

210.    The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "*How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[66]

211.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[67]

212.    The dramatic difference in the price of healthcare data when compared to other forms of private information that is commonly sold is evidence of the value of PHI.

213.    But these rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

---

[64] *See Valuing Healthcare Data*, https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf (last visited Mar. 5, 2024).

[65] *See* https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (citing *The Value of Data*, https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf) (last visited Mar. 5, 2024).

[66] *See* https://time.com/4588104/medical-data-industry/ (last visited Mar. 5, 2024).

[67] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Mar. 5, 2024).

214.    In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

## TOLLING, CONCEALMENT & ESTOPPEL

215.    The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

216.    Defendant secretly incorporated the Meta Pixel into its Web Properties and patient portals, providing no indication to Users that their User Data, including their Private Information, would be disclosed to unauthorized third parties.

217.    Defendant had exclusive knowledge that the Meta Pixel was incorporated on its Web Properties, yet failed to disclose that fact to Users, or inform them that by interacting with its Web Properties, Plaintiff's and Class Members' User Data, including Private Information, would be disclosed to third parties, including Facebook.

218.    Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendant's conduct because the incorporation of Meta Pixels is highly technical and there were no disclosures or other indications that would inform a reasonable consumer that Defendant was disclosing and allowing Facebook to intercept Users' Private Information.

219.    The earliest Plaintiff and Class Members could have known about Defendant's conduct was approximately in April or May of 2023. Nevertheless, at all material times herein, Defendant falsely represented to Plaintiff that her health information is not and will not be disclosed to any third party.

220.    As alleged above, Defendant has a duty to disclose the nature and significance of its data disclosure practices but failed to do so. Defendant is therefore estopped from relying on any statute of limitations under the discovery rule.

## CLASS ALLEGATIONS

221.    **Class Definition:** Plaintiff brings this action on behalf of herself and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.:

222.    The Nationwide Class that Plaintiff seeks to represent is defined as:

**Nationwide Class**: All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the Meta Pixel on Defendant's Web Properties.

223.    The Ohio Subclass that Plaintiff seeks to represent is defined as:

**Ohio Subclass:** All individuals residing in the State of Ohio  whose Private Information was disclosed to a third party without authorization or consent through the Meta Pixel on Defendant's Web Properties.

224.    The Nationwide Class, and the Ohio Subclass are referred to collectively as the "Classes." Excluded from the Classes are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant's officer or director, any successor or assign and any Judge who adjudicates this case, including their staff and immediate family.

225.    **The following people are excluded from the Classes:** (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

226.    Plaintiff reserves the right under Federal Rule of Civil Procedure 23 to amend or modify the Classes to include a broader scope, greater specificity, further division into subclasses, or limitations to particular issues. Plaintiff reserves the right under Federal Rule of Civil Procedure 23(c)(4) to seek certification of particular issues.

227.    The requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are met in this case.

228.    The Fed. R. Civ. P. 23(a) elements of Numerosity, Commonality, Typicality, and Adequacy are all satisfied.

229.    **Numerosity:** The exact number of Class Members is not available to Plaintiff, but it is clear that individual joinder is impracticable. Hundreds of thousands of people have used Defendant's

Web Properties since at least 2017. Members of the Class can be identified through Defendant's records or by other means.

230.    **Commonality:** Commonality requires that the Class Members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke. Here, there is a common contention for all Class Members as to whether Defendant disclosed to third parties their Private Information without authorization or lawful authority.

231.    **Typicality:** Plaintiff's claims are typical of the claims of other Class Members in that Plaintiff and the Class Members sustained damages arising out of Defendant's uniform wrongful conduct and data sharing practices.

232.    **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff's claims are made in a representative capacity on behalf of the Class Members. Plaintiff has no interests antagonistic to the interests of the other Class Members. Plaintiff has retained competent counsel to prosecute the case on behalf of Plaintiff and the Class. Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the Class members.

233.    The declaratory and injunctive relief sought in this case includes, but is not limited to:

    a.    Entering a declaratory judgment against Defendant—declaring that Defendant's interception of Plaintiff's and Class Members' Private Information is in violation of the law;

    b.    Entering an injunction against Defendant:
        i.    preventing Defendant from sharing Plaintiff's and Class Members' Private Information among itself and other third parties;
        ii.    requiring Defendant to alert and/or otherwise notify all users of its websites and portals of what information is being collected, used, and shared;
        iii.    requiring Defendant to provide clear information regarding its practices concerning data collection from the users/patients of Defendant's Web Properties, as well as uses of such data;
        iv.    requiring Defendant to establish protocols intended to remove all personal information which has been leaked to Facebook and/or other third parties, and request Facebook/third parties to remove such information;

v. and requiring Defendant to provide an opt out procedure for individuals who do not wish for their information to be tracked while interacting with Defendant's Web Properties.

234. **Predominance:** There are many questions of law and fact common to the claims of Plaintiff and Class Members, and those questions predominate over any questions that may affect individual Class Members. Common questions and/or issues for Class members include, but are not necessarily limited to the following:

a. Whether Defendant's acts and practices violated California's Constitution, Art. 1, § 1;

b. Whether Defendant's acts and practices violated California's Confidentiality of Medical Information Act, Civil Code §§ 56, *et seq.*;

c. Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;

d. Whether Defendant's unauthorized disclosure of Users' Private Information was negligent;

e. Whether Defendant owed a duty to Plaintiff's and Class Members not to disclose their Private Information to unauthorized third parties;

f. Whether Defendant breached its duty to Plaintiff and Class Members not to disclose their Private Information to unauthorized third parties;

g. Whether Defendant represented to Plaintiff and the Class that it would protect Plaintiff's and the Class Members' Private Information;

h. Whether Defendant violated Plaintiff's and Class Members' privacy rights;

i. Whether Defendant's practices violated California's Confidentiality of Medical Information Act, Civ. Code §§ 56, *et seq.*;

j. Whether Defendant's practices violated California's Constitution, Art. 1, § 1;

k. Whether Plaintiff and Class Members are entitled to actual damages, enhanced damages, statutory damages, and other monetary remedies provided by equity and law;

l. Whether injunctive and declaratory relief, restitution, disgorgement, and other equitable relief is warranted.

235.    **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by individual Class Members will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual Class Members to obtain effective relief from Defendant's misconduct. Even if Class Members could mount such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be enhanced, and uniformity of decisions ensured.

236.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Defendant misrepresented that it would disclose personal information only for limited purposes that did not include purposes of delivering advertisements or collecting data for commercial use or supplementing consumer profiles created by data aggregators and advertisers;

b.    Whether Defendant's privacy policies misrepresented that it collected and shared User information with third-party service providers only for the limited purpose of providing access to its services;

c.    Whether Defendant misrepresented that it had in place contractual and technical protections that limit third-party use of User information and that it would seek User consent prior to sharing Private Information with third parties for purposes other than provision of its services;

d.    Whether Defendant misrepresented that any information it receives is stored under the same guidelines as any health entity that is subject to the strict patient data sharing and protection practices set forth in the regulations propounded under HIPAA;

e.  Whether Defendant misrepresented that it complied with HIPAA's requirements for protecting and handling Users' PHI;

f.  Whether Defendant shared the Private Information that Users provided to Defendant with advertising platforms, including Facebook, without adequate notification or disclosure, and without Users' consent, in violation of health privacy laws and rules and its own privacy policy;

g.  Whether Defendant integrated third-party tracking tools, consisting of automated web beacons or any other Pixel in its website that shared Private Information and User activities with third parties for unrestricted purposes, which included advertising, data analytics, and other commercial purposes;

h.  Whether Defendant shared Private Information and activity information with Facebook using Facebook's Pixels on its Web Properties without Users' consent;

i.  Whether Facebook used the information that Defendant shared with it for unrestricted purposes, such as selling targeted advertisements, data analytics, or other commercial purposes.

## CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

### (*On behalf of Plaintiff & the Nationwide Class*)

237.  Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

238.  Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class, Defendant owed, and continues to owe, a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive Private Information.

239.  Defendant breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

240.  It was reasonably foreseeable that Defendant's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information through its use of the Pixels, Conversions API, and other tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

241.    Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship that existed between Defendant and its patients, which is recognized by statute, regulations, and the common law.

242.    In addition, Defendant had a duty under Health Insurance Portability and Accountability Act of 1996 ("HIPAA") privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

243.    Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included the failure to (1) secure Plaintiff's and Class Members' Private Information; (2) comply with industry standard data security practices; (3) implement adequate website and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of the Pixels, Conversions API, and other tracking technologies.

244.    As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and Class Members' Private Information, Plaintiff and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

245.    Defendant's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted (and continue to constitute) negligence at common law.

246.    Plaintiff and the Class are entitled to recover damages in an amount to be determined at trial.

**COUNT III**

**BREACH OF CONFIDENCE**

(*On behalf of Plaintiff & the Nationwide Class*)

247.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

248.    Possessors of non-public medical information, such as Defendant, have a duty to keep such medical information completely confidential.

249.    Plaintiff and Class Members had reasonable expectations of privacy in the responses and communications entrusted to Defendant through its Website, which included highly sensitive Private Information.

250.    Contrary to its duties as a telehealth institution and its express promises of confidentiality, Defendant installed the Pixels and/or Conversions API to disclose and transmit to third parties Plaintiff's and Class Members' Private Information, including data relating to Plaintiff's and Class Members' health.

251.    These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization.

252.    The third-party recipients included, but may not be limited to, Meta and Google.

253.    As a direct and proximate cause of Defendant's unauthorized disclosures of Plaintiff's and Class Members' Private Information, Plaintiff and Class Members were damaged by Defendant's breach of confidentiality in that (a) sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private; (b) Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements; (c) Defendant eroded the essential confidential nature of health services that Plaintiff and Class Members participated in; (d) general damages for invasion of their rights in an amount to be determined by a jury at trial; (e) nominal damages for each independent violation; (f) the unauthorized use of something of value (the highly sensitive Private Information) that belonged to Plaintiff and Class Members and the obtaining of a benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation to Plaintiff or Class Members for the unauthorized use of such data; (g) diminishment of the value of Plaintiff's and Class Members' Private Information; and (h) violation of

property rights Plaintiff and Class Members have in their Private Information.

## COUNT IV

### UNJUST ENRICHMENT

### (*On behalf of Plaintiff & the Nationwide Class*)

254.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

255.    Plaintiff and Class Members personally and directly conferred a benefit on Defendant by paying Defendant for health care services, which included Defendant's obligation to protect Plaintiff's and Class Members' Private Information. Defendant was aware of Plaintiff's privacy expectations, and in fact, promised to maintain Plaintiff's Private Information confidential and not to disclose to third parties. Defendant received payments for medical services from Plaintiff and Class Members.

256.    Plaintiff and Class Members also conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement, market research, sale, or trade for valuable benefits from Facebook and other third parties. Defendant had knowledge that Plaintiff and Class Members had conferred this benefit on Defendant by interacting with its Web Properties, and Defendant intentionally installed the Meta Pixel tool on its Web Properties to capture and monetize this benefit conferred by Plaintiff and Class Members.

257.    Plaintiff and Class Members would not have used Defendant's Web Properties had they known that Defendant would collect, use, and disclose this information to Facebook, Google, and other third parties. The services that Plaintiff and Class Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

258.    The medical services that Defendant offers are available from many other health care systems that do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff's and Class Members' Private Health Information without consent, neither Plaintiff, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

259.    By virtue of the unlawful, unfair and deceptive conduct alleged herein, Defendant knowingly realized hundreds of millions of dollars in revenue from the use of the Private Information of Plaintiff and Classes Members for profit by way of targeted advertising related to Users' respective medical conditions and treatments sought.

260.    This Private Information, the value of the Private Information, and/or the attendant revenue, were monetary benefits conferred upon Defendant by Plaintiff and Class Members.

261.    As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages in the loss of value of their Private Information and the lost profits from the use of their Private Information.

262.    It would be inequitable and unjust to permit Defendant to retain the enormous economic benefits (financial and otherwise) it has obtained from and/or at the expense of Plaintiff and Class Members.

263.    Defendant will be unjustly enriched if it is permitted to retain the economic benefits conferred upon it by Plaintiff and Class Members through Defendant's obtaining the Private Information and the value thereof, and profiting from the unlawful, unauthorized and impermissible use of the Private Information of Plaintiff and Class Members.

264.    Plaintiff and Class Members are therefore entitled to recover the amounts realized by Defendant at the expense of Plaintiff and Class Members.

265.    Plaintiff and the Class Members have no adequate remedy at law and are therefore entitled to restitution, disgorgement, and/or the imposition of a constructive trust to recover the amount of Defendant's ill-gotten gains, and/or other sums as may be just and equitable.

## **COUNT V**

**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**

**18 U.S.C. § 2511(1),** *et seq.*

(*On Behalf of Plaintiff and the Nationwide Class*)

266.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

267.    The ECPA protects both sending and receipt of communications.

268.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

269.    The transmissions of Plaintiff's PII and PHI to Defendant's Web Properties qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

270.    **Electronic Communications**. The transmission of PII and PHI between Plaintiff and Class Members and Defendant's Web Properties with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

271.    **Content**. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

272.    Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding PII and PHI, diagnosis of certain conditions, treatment/medication for such conditions, and scheduling of appointments, including annual mammograms, surgeries, ER visits, lab work, and scans. Furthermore, Defendant intercepted the "contents" of Plaintiff's communications in at least the following forms:

        a.    The parties to the communications;

        b.    The precise text of patient search queries;

        c.    Personally, identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d.   The precise text of patient communications about specific doctors;

e.   The precise text of patient communications about specific medical conditions;

f.   The precise text of information generated when patients requested or made appointments,

g.   The precise text of patient communications about specific treatments;

h.   The precise text of patient communications about scheduling appointments with medical providers;

i.   The precise text of patient communications about billing and payment;

j.   The precise text of specific buttons on Defendant's Web Properties that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

k.   The precise dates and times when patients click to Log-In on Defendant's Web Properties;

l.   The precise dates and times when patients visit Defendant's Web Properties;

m.   Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information.

273.   **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

274.   **Electronical, Mechanical or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic

communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

      a.   Plaintiff's and Class Members' browsers;

      b.   Plaintiff's and Class Members' computing devices

      c.   Defendant's web servers; and

      d.   The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

275.   By utilizing and embedding the Pixel on its Web Properties, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

276.   Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixel, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to third parties such as Facebook.

277.   Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding PII and PHI, treatment, medication, and scheduling.

278.   This information was, in turn, used by third parties, such as Facebook to 1) place Plaintiff and Class Members in specific health-related categories and 2) target Plaintiff and Class Members with particular advertising associated with their specific health conditions.

279.   By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

280.   By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

281.    <u>Unauthorized Purpose</u>. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

282.    The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

283.    Defendant is not a party for purposes to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information does not qualify for the party exemption.

284.    Here, as alleged above, Defendant violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing PII to a third party. HIPAA defines PII as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

285.    Plaintiff's and Class Members' information that Defendant disclosed to third parties qualifies as PII, and Defendant violated Plaintiff's expectations of privacy, and constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d(6). Defendant intentionally used the wire or electronic communications to intercept Plaintiff Private Information in violation of the law.

286.    Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:  Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and disclosed individually identifiable health information to Facebook without patient authorization.

287.    The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

288.    Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

289.    Defendant's acquisition of patient communications that were used and disclosed to Facebook was also done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

        a.    Invasion of privacy;

        b.    Breach of confidence;

        c.    Breach of fiduciary duty;

        d.    California Invasion of Privacy Act, §§ 630, et seq.;

        e.    California Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56, *et seq.*;

290.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Private Information on its Web Properties, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Private Information with Facebook and third-parties that did not participate in these communications, that Plaintiff and Class Members did not know was receiving their information, and that Plaintiff and Class Members did not consent to receive this information.

291.    As such, Defendant cannot viably claim any exception to ECPA liability.

292.    Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

        a.    Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their PII and PHI (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and

health insurance and medical bills) for commercial purposes has caused Plaintiff and the Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiff's and the Class Members' PII and PHI without providing any value or benefit to Plaintiff or the Class members;

c. Defendant received substantial, quantifiable value from its use of Plaintiff's and the Class Members' PII and PHI, such as understanding how people use its Web Properties and determining what ads people see on its Web Properties, without providing any value or benefit to Plaintiff or the Class Members;

d. Defendant has failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of its patient information; and

e. The diminution in value of Plaintiff's and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, medical treatment, and appointments that Plaintiff and Class Members intended to remain private no longer private.

293. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiff's and Class Members' Private Information for financial gain.

294. Defendant was not acting under color of law to intercept Plaintiff's and the Class Members' wire or electronic communication.

295. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixel.

296. Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

297. Consumers have the right to rely upon the promises that companies make to them. Defendant accomplished its tracking and retargeting through deceit and disregard, such that an actionable claim may be made, in that it was accomplished through source code that caused third-party Pixels and cookies (including but not limited to the fbp, ga and gid cookies) and other tracking

technologies to be deposited on Plaintiff's and Class members' computing devices as "first-party" cookies that are not blocked.

298.    Defendant's scheme or artifice to defraud in this action consists of:

a.    the false and misleading statements and omissions in its privacy policy set forth above, including the statements and omissions recited in the claims below;

b.    the placement of the 'fbp' cookie on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Facebook.

299.    Defendant acted with the intent to defraud in that it willfully invaded and took Plaintiff's and Class Members' property:

a.    property rights to the confidentiality of Private Information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and/or use such information for marketing purposes; and

b.    property rights to determine who has access to their computing devices.

300.    In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Web Properties, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

301.    As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT VI

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ("CIPA"), CAL. PENAL CODE § 630, *et seq.*

#### *(On behalf of Plaintiff and the Nationwide Class)*

302.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth

herein.

303.    Defendant is a person for purposes of Cal. Penal Code §631.

304.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

a.    "intentionally taps, or makes any unauthorized connection…with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,"

b.    "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within [the state of California],"

c.    "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or

d.    "*aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section*" (emphasis added).

305.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

306.    Defendant's Web Properties are a "machine, instrument, contrivance, or ... other manner" used to engage in the prohibited conduct at issue here.

307.    At all relevant times, Defendant entered into contracts with Facebook, in order to track certain activities on its Web Properties. Defendant allowed Facebook to intercept and otherwise track Users' clicks, communications, searches, and other User activities.

308.    Defendant activated Meta Pixel tracking tools, allowing Facebook to intentionally tap, and make unauthorized connections with, the lines of internet communication between Plaintiff and Class Members on the one hand, and Defendant's Web Properties on the other hand, without consent of all parties to the communication.

309.    At all relevant times, by using the Meta Pixel, Facebook willfully and without the consent of Plaintiff and Class Members, read or attempted to learn the contents or meaning of electronic communications of Plaintiff and putative Class Members on Defendant's Web Properties. This occurred while the electronic communications were in transit or passing over any wire, line, or cable, or were being sent from or received at any place within California. Facebook intercepted Plaintiff's and Class Members' communications – including the very terms and phrases they typed into the search bar – without their authorization or consent.

310.    Defendant knowingly installed Pixel tracking technology on its Web Properties, which systematically transmitted all communications between Plaintiff and the Defendant's Web Properties to Meta. Indeed, Meta released an explicit statement to the Court on November 9, 2022, that it neither desired nor intended to possess health information data. In April 2018, Meta proactively added a clause to its user contract specifying that it requires each of its partners, including Defendant, to have "lawful" rights to collect, use, and share user data before providing any data to Meta.

311.    Defendant had the explicit option to disable the Pixel technology on its Web Properties, but chose not to exercise this option, thereby continuing to share data with Facebook despite the availability of preventive measures.

312.    These assertions highlight that Meta advised third party entities, like Defendant, to refrain from sending any information it did not have the legal right to send and expressly emphasized not to transmit health information. Yet, Defendant, in direct contravention of these advisories and in

a clear display of intent, continued to employ Pixel tracking on its Web Properties, thereby sharing sensitive patient data without proper authorization or consent.

313.    By embedding Pixels on its Web Properties, Defendant aided, agreed with, employed, and conspired with Facebook to wiretap consumers communications on Defendant's Web Properties using the Meta Pixel snipped codes and to accomplish the wrongful conduct at issue here.

314.    Plaintiff and Class Members did not consent to the interception, reading, learning, recording, and collection of their electronic communications with Defendant. Accordingly, the interception was unlawful and tortious.

315.    Defendant both intercepted and aided Facebook in the interception of "contents" of Plaintiff's communications in at least the following forms:

        a.    The parties to the communications;

        b.    The precise text of patient search queries;

        c.    Personally identifying information such as patients' IP addresses,

        d.    Facebook IDs, browser fingerprints, and other unique identifiers;

        e.    The precise text of patient communications about specific doctors;

        f.    The precise text of patient communications about specific medical

        g.    conditions;

        h.    The precise text of information generated when patients requested or

        i.    made appointments;

        j.    The precise text of patient communications about specific treatments;

        k.    The precise text of patient communications about scheduling

        l.    appointments with medical providers;

        m.    The precise text of patient communications about billing and payment;

        n.    The precise text of specific buttons on Defendant's Webs Properties that

        o.    patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

        p.    The precise dates and times when patients click to Log-In on

q.    Defendant's Web Properties;

r.    The precise dates and times when patients visit Defendant's Web

s.    Properties;

t.    Information that is a general summary or informs third parties of the

u.    general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

v.    Any other content that Defendant has aided third parties in scraping

w.    from webpages or communication forms at Web Properties.

316.    Defendant gave substantial assistance to Facebook in violating the privacy rights of Defendant's patients, despite the fact that Defendant's conduct constituted a breach of the duties of confidentiality that medical providers owe their patients. Defendant knew that the installation of the Meta Pixel on its Web Properties would result in the unauthorized disclosure of its patients' communications to Facebook, yet nevertheless did so anyway.

317.    The violation of section 631(a) constitutes an invasion of privacy sufficient to confer Article III standing.

318.    Unless enjoined, Defendant will continue to commit the illegal acts alleged here. Plaintiff continues to be at risk because she frequently uses Defendant's Web Properties to search for information about medical products, health conditions or services. Plaintiff continues to desire to use the Defendant's Web Properties for that purpose, including but not limited to investigating health conditions (e.g., diabetes), diagnoses (e.g., COVID-19), procedures, test results, treatment status, the treating physician, medications, and/or allergies.

319.    Plaintiff and Class Members may or are likely to visit Defendant's Web Properties in the future but have no practical way of knowing whether their website communications will be collected, viewed, accessed, stored, and used by Facebook.

320.    Plaintiff and Class Members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

321.     In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages: (1) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private; and (2) Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

**COUNT VII**

**VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT ("CMIA"), CAL. CIV. CODE § 56, *et seq.***

**(*On behalf of Plaintiff & the Nationwide Class*)**

322.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

323.     Defendant is subject to the CMIA pursuant to California Civil Code § 56.10 because it is a "provider of health care" as defined by California Civil Code § 56.06(b).

324.     Section 56.10 states, in pertinent part, that "[n]o provider of health care . . . shall disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization . . . ."

325.     Section 56.101 of the CMIA states, in pertinent part, that "[a]ny provider of health care . . . who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties . . ." Cal. Civ. Code §§ 56.10, 56.101.

326.     Plaintiff's and Class Members' Private Information constitutes "medical information" under the CMIA because it consists of individually identifiable information in possession of and derived from a provider of healthcare regarding Plaintiff's and Class Members' medical history, test results, mental or physical condition, and/or treatment.

327.     Defendant violated Cal. Civ. Code § 56.10 because it failed to maintain the confidentiality of Users' medical information, and instead "disclose[d] medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization" by soliciting, intercepting, and receiving Plaintiff's and Class Members' Private Information, and sharing it with advertisers and for advertising purposes.

Specifically, Defendant knowingly, willfully, or negligently disclosed Plaintiff's and Class Members' medical information to Facebook, allowing Facebook to now advertise and target Plaintiff and Class Members, misusing their extremely sensitive Private Information.

328.    Defendant violated Cal. Civ. Code § 56.101 because it knowingly, willfully, or negligently failed to create, maintain, preserve, store, abandon, destroy, and dispose of medical information in a manner that preserved its confidentiality by soliciting, intercepting, and receiving Plaintiff's and Class Members' Private Information, and sharing it with advertisers and for advertising purposes for Facebook's and Defendant's financial gain.

329.    Defendant intentionally embedded Pixels and Conversions API, which facilitate the unauthorized sharing of Plaintiff's and Class Members' medical information.

330.    Defendant violated Cal Civ. Code § 56.36(b) because it negligently released confidential information and records concerning Plaintiff and Class Members in violation of their rights under the CMIA.

331.    As a direct and proximate result of Defendant's misconduct, Plaintiff and Class Members had their private communications containing information related to their sensitive and confidential Private Information intercepted, disclosed, viewed, and used by third parties.

332.    As a result of Defendant's unlawful conduct, Plaintiff and Class Members suffered an injury, including violation to their rights of privacy, loss of the privacy of their Private Information, loss of control over their sensitive personal information, and suffered aggravation, inconvenience, and emotional distress.

333.    Plaintiff and Class Members are entitled to: (a) nominal damages of $1,000 per violation; (b) actual damages, in an amount to be determined at trial; (c) reasonable attorneys' fees, and costs.

## COUNT VIII

### VIOLATION OF THE UNFAIR COMPETITION LAW ("UCL"), CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *et seq*.

#### *(On behalf of Plaintiff and the Nationwide Class)*

334. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

**A. Unlawful Prong**

335. Defendant's conduct as alleged herein was unfair within the meaning of the UCL. The unfair prong of the UCL prohibits unfair business practices that either offend an established public policy or that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

336. Defendant's conduct, as alleged herein, was also fraudulent within the meaning of the UCL. Defendant made deceptive misrepresentations and omitted known material facts in connection with the solicitation, interception, disclosure, and use of Plaintiff's and Nationwide Class Members' Private Information. Defendant actively concealed and continued to assert misleading statements regarding its protection and limitation on the use of the Private Information. Meanwhile, Defendant was collecting and sharing Plaintiff's and Nationwide Class Members' Private Information without their authorization or knowledge to profit off of the information, and deliver targeted advertisements to Plaintiff and Nationwide Class Members, among other unlawful purposes.

337. Defendant's conduct, as alleged herein, was unlawful within the meaning of the UCL because it violated regulations and laws as discussed herein, including but not limited to HIPAA, Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq*.

338. Had Plaintiff and Nationwide Class Members known Defendant would disclose and misuse their Private Information in contravention of Defendant's representations, they would never have used Defendant's Web Properties Portal and would not have shared their Private Information.

339. Defendant's unlawful actions in violation of the UCL have caused and are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

340. As a direct and proximate result of Defendant's misconduct, Plaintiff and Nationwide Class Members had their private communications containing information related to their sensitive and

confidential Private Information intercepted, disclosed, and used by third parties, including but not limited to Facebook.

341.    As a result of Defendant's unlawful conduct, Plaintiff and Nationwide Class Members suffered an injury, including violation to their rights of privacy, loss of value and privacy of their Private Information, loss of control over their sensitive personal information, and suffered embarrassment and emotional distress as a result of this unauthorized sharing of information.

**B. Unfair Prong**

342.    Defendant engaged in unfair business practices by disclosing Plaintiff's and Nationwide Class Members' Private Information to unrelated third parties, including Facebook, without prior consent despite its promises to keep such information confidential.

343.    Defendant's unfair business practices included widespread violations of Plaintiff's and Nationwide Class Members' rights to privacy, including its failure to inform the public that using its Web Properties would result in disclosure of highly private information to third parties.

344.    Because Defendant are in the business of providing medical healthcare services, Plaintiff and Nationwide Class Members relied on Defendant to advise them of any potential disclosure of their Private Information.

345.    Plaintiff and Nationwide Class Members were entitled to assume, and did assume, that Defendant would take appropriate measures to keep their Private Information secure and confidential. At no point did Plaintiff expect to become a commodity on which Defendant and Facebook would trade.

346.    Plaintiff and Nationwide Class Members reasonably relied upon the representations Defendant made in its Privacy Policy, including those representations concerning the confidentiality of Private Information, such as patient health information.

347.    Defendant was in sole possession of and had a duty to disclose the material information that Plaintiff and Nationwide Class Members' private information was being shared with third parties.

348.    Had Defendant disclosed that it shared Private Information with third parties, Plaintiff and the Nationwide Class would not have used Defendant's services at the level they did.

349.   The harm caused by the Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests other than Defendant's conduct described herein.

350.   Defendant's acts, omissions and conduct also violate the unfair prong of the UCL because those acts, omissions and conduct offended public policy (including the aforementioned federal and state privacy statutes and state consumer protection statutes, such as HIPAA), and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff and Nationwide Class Members.

351.   As a direct result of Plaintiff's and Nationwide Class Members' reliance on Defendant's representations that Defendant would keep their Private Information confidential and Defendant's express representation that it would not share Private Information with third parties without the Users' express consent, Plaintiff and Nationwide Class Members shared highly sensitive information through their use of the Web Properties, causing them to suffer damages when Defendant disclosed said information to a third party.

352.   As a direct result of Defendant's violations of the UCL, Plaintiff and Nationwide Class Members have suffered injury in fact and lost money or property, including but not limited to payments to Defendant and/or other valuable consideration. The unauthorized access to Plaintiff's and Nationwide Class Members' private and personal data also diminished the value of that Private Information.

353.   As a direct result of its unfair practices, Defendant has been unjustly enriched and should be required to make restitution to Plaintiff and Nationwide Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant because of its unlawful business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5) and injunctive or other equitable relief.

## COUNT IX

### INVASION OF PRIVACY UNDER CALIFORNIA'S CONSTITUTION, ART. I, § 1.

*(On behalf of Plaintiff and the Nationwide Class)*

354.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

355.    Art. I, § 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., Art. I, § 1.

356.    The right to privacy in California's Constitution creates a private right of action against private and government entities.

357.    Plaintiff and Class Members have and continue to have a reasonable expectation of privacy and interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without their knowledge, authorization, or consent.

358.    At all relevant times, by using Facebook's Meta Pixel to record and communicate individually identifying information alongside their confidential medical communications, Defendant invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

359.    Plaintiff and Class Members had a reasonable expectation that their communications, identity, health information, and other data would remain confidential, and that the Defendant would not install wiretaps on its Web Properties to secretly transmit communications to a third party.

360.    Plaintiff and Class Members did not authorize the Defendant to record and transmit their Private Information – including private medical communications alongside their personally identifiable health information – to a third party, Facebook. *See* Figures 2-15 of Defendant's Web Properties above.

361.    This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

362.   As a result of the Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

363.   Plaintiff and Class Members have been damaged as a direct and proximate result of the Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

364.   Plaintiff and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusion(s) upon Plaintiff's and Class Members' privacy.

365.   Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of the Defendant's conduct, injuring Plaintiff and Class Members in conscious disregard of their rights.

366.   Plaintiff seeks all other relief as the Court may deem just, proper, and available for invasion of privacy under the California Constitution, on behalf of the Class.

<u>**COUNT X**</u>

**INVASION OF PRIVACY/INTRUSION UPON SECLUSION**

***(On behalf of Plaintiff and the Nationwide Class)***

350.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

351.   Plaintiff and Nationwide Class Members had a reasonable and legitimate expectation of privacy in the Private Information that Defendant failed to adequately protect against disclosure from unauthorized parties.

352.   Defendant owed a duty to Plaintiff and Nationwide Class Members to keep their Private Information confidential.

353.   Defendant failed to protect and release to unknown and unauthorized third parties the Private Information of Plaintiff and Nationwide Class Members.

354.   By failing to keep Plaintiff's and Nationwide Class Members' Private Information confidential and safe from misuse, Defendant knowingly shared highly sensitive Private Information with Facebook, Defendant unlawfully invaded Plaintiff's and Nationwide Class Members' privacy by,

among others: (i) intruding into Plaintiff's and Nationwide Class Members' private affairs in a manner that would be highly offensive to a reasonable person; (ii) failing to adequately secure their Private Information from disclosure to unauthorized persons; and (iii) enabling and facilitating the disclosure of Plaintiff's and Class Members' Private Information without authorization or consent.

355.    Plaintiff's and Nationwide Class Members' expectation of privacy was and is especially heightened given Defendant's consistent representations that Users' information would remain confidential and would not be disclosed to anyone without User consent.

356.    Defendant's privacy policy specifically provides, "We will not sell, trade or rent your personal information to other people or businesses unless we have your consent."[68]

357.    Defendant knew, or acted with reckless disregard of the fact that a reasonable person in Plaintiff's and Nationwide Class Members' position would consider its actions highly offensive.

358.    Defendant's unauthorized surreptitious recording, monitoring, and sharing of the Users' activities, searches, researching diagnosis and treatment, searching for doctors and medical specialists violated expectations of privacy that have been established by social norms.

359.    As a proximate result of such unauthorized disclosures, Plaintiff's and Nationwide Class Members' reasonable expectations of privacy in their Private Information was unduly frustrated and thwarted and caused damages to Plaintiff and Nationwide Class Members.

360.    Plaintiff and Nationwide Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's conduct, directed at injuring Plaintiff and Nationwide Class Members in conscious disregard of their rights.

361.    Plaintiff seeks injunctive relief on behalf of the Nationwide Class, restitution, as well as any and all other relief that may be available at law or equity. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause irreparable injury to Plaintiff and Nationwide Class Members. Plaintiff and Nationwide Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the Nationwide Class.

---

[68] *Notice of Privacy Policy*, *supra* note 40.

## COUNT XI

### VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE § 1750, *ET SEQ.* ("CLRA")

#### (*On behalf of Plaintiff & the Nationwide Class*)

362.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

363.    Defendant engaged in "unfair methods of competition and unfair or deceptive acts . . . in a transaction . . . that result[ed] . . . in the sale . . . of goods" to Plaintiff and the Class Members in violation of Cal. Civ. Code § 1750 and Cal. Civ. Code § 1770(a)(5), (7), (9), (14), (16).

364.    For instance, Defendant made representations that it would protect Plaintiff's and the Subclass Members' privacy interest, including promising that it will keep Private Information private and secure, that Defendant does not sell Users' Private Information, and that it will only disclose Private Information under certain circumstances, none of which was true.

365.    Defendant made these representations with no intention of living up to these representations. Contrary to these representations, Defendant disclosed and allowed third parties to intercept its customers' Private Information.

366.    Further, Defendant failed to disclose it secretly shared, used, and allowed third parties to intercept Plaintiff's and Subclass Members' Private Information.

367.    Defendant was under a duty to disclose this information given Defendant's relationship with its customers and Defendant's exclusive knowledge of its misconduct (e.g., the tracking technology incorporated on Defendant's Website, the fact that Private Information is disclosed to unauthorized third parties, that Defendant allowed third parties to intercept Private Information through this technology, and how Defendant and third parties used this data).

368.    Plaintiff and Subclass Members would not have purchased, or would have paid significantly less for, Defendant's medical services had Defendant not made these false representations. Defendant profited directly from these sales, including through payment for these services, and from the Private Information disclosed and intercepted.

369.   Plaintiff, individually and on behalf of the Subclass Members, seeks an injunction requiring Defendant to obtain consent prior to disclosing and otherwise using Plaintiff's and Subclass Members' Private Information and to delete the Private Information already collected, and any other relief which the court deems proper.

### COUNT XII

### LARCENY/RECEIPT OF STOLEN PROPERTY, VIOLATION OF CALIFORNIA PENAL CODE § 496(A) AND (C)

***(On behalf of Plaintiff and the Nationwide Class)***

370.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

371.   Courts recognize that internet users have a property interest in their personal information and data. *See Calhoun v. Google, LLC,* 526 F. Supp. 3d 605, at *21 (N.D. Cal. Mar. 17, 2021) (recognizing property interest in personal information and rejecting Google's argument that "the personal information that Google allegedly stole is not property"); *In re Experian Data Breach Litigation,* 2016 U.S. Dist. LEXIS 184500, at *5 (C.D. Cal. Dec. 29, 2016) (loss of value of PII is a viable damages theory); *In re Marriott Int'l Inc. Customer Data Sec. Breach Litig.,* 440 F. Supp. 3d 447, 460 (D. Md. 2020) ("The growing trend across courts that have considered this issue is to recognize the lost property value of this [personal] information."); *Simona Opris v. Sincera,* 2022 U.S. Dist. LEXIS 94192, at *20 (E.D. Pa. 2022) (collecting cases).

372.   Cal. Penal Code §496(c) permits "any" person who has been injured by a violation of section 496(a) to recover three times the amount of actual damages, costs of suit and attorney's fees in a civil suit.

373.   Penal Code § 496(a) creates an action against "any" person who (1) receives "any" property that has been stolen or obtained in any manner constituting theft, knowing the property to be stolen or obtained, or (2) conceals, sells, withholds, or aids in concealing or withholding "any" property from the owner, knowing the property to be so stolen or illegally obtained.

374.   Under Penal Code § 1.07(a)(38), "person" means "an individual, corporation, or association." Thus, Defendant is a person under section 496(a).

375.    As set forth herein, the Users' Private Information was stolen or obtained by theft, without limitation, under Penal Code §484, by false or fraudulent representations or pretenses. At no point did the Defendant have Plaintiff's and Class Members' consent to duplicate their searches, and send them to Facebook.

376.    Defendant meets the grounds for liability of <u>section 496(a)</u> because it:

    a.   knew the Private Information was stolen or obtained by theft and/or false

    b.   pretenses; and, with such knowledge,

    c.   transmitted such information to unauthorized third parties, like Facebook.

377.    Defendant violated the second ground for liability of section 496(a) because it:

    d.   knew the Private Information was stolen or obtained by theft; and, with such knowledge,

    e.   concealed, withheld, or aided in concealing or withholding said data from their rightful owners by unlawfully tracking the data and disclosing it to unauthorized third parties, like Facebook.

378.    As a direct and proximate result of the acts and omissions described above, Plaintiff and Class Members were injured by the Defendant's violations of section 496(a).

379.    Pursuant to California Penal Code § 496(c), the Plaintiff and Class Members seek actual damages, treble damages, costs of suit, and reasonable attorneys' fees.

**<u>COUNT XIII</u>**

**BREACH OF FIDUCIARY DUTY**

***(On Behalf of Plaintiff and the Nationwide Class)***

380.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

381.    In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act

primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

382.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant' relationship with its patients and former patients, in particular, to keep secure their Private Information.

383.    Defendant breached its fiduciary duties to Plaintiff and Class Members by disclosing their Private Information to unauthorized third parties, and separately, by failing to notify Plaintiff and Class Members of this fact.

384.    As a direct and proximate result of Defendant' breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be proven at trial.

## <u>COUNT XIV</u>

### VIOLATIONS OF THE OHIO DATA BREACH STATUTE, OHIO. REV. CODE ANN. § 1349.19

#### *(On behalf of Plaintiff & the Ohio Subclass)*

385.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

    a.   The acts and practices alleged herein occurred in trade or commerce in the state of Ohio.

    b.   The Data Breach, which compromised the Private Information of Plaintiff, an Ohio citizen, constitutes a "[b]reach of the security of the system," as that term is defined by Ohio Rev. Code Ann. § 1349.19(A)(1)(a).

    c.   Defendant has not yet notified Plaintiff or any other member of the Ohio Subclass that their Private Information was acquired and used by an unauthorized person or used for an unauthorized purpose.

d.    Thus, Defendant has unreasonably delayed the disclosure of the "breach of the security of the system" of Private Information within the meaning of Ohio Rev. Code Ann. § 1349.19(B)(1).

e.    Pursuant to Ohio Rev. Code Ann. § 1349.19(B)(1), Defendant's failure to timely disclose the Data Breach following discovery "in the most expedient time possible but not later than forty-five days following its discovery or notification of the breach in the security of its system," was a breach of Ohio Rev. Code Ann. § 1349.19(B)(2).

<u>COUNT XV</u>

**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT, OHIO REV. CODE ANN. § 1345.01, *ET SEQ*.**

***(On behalf of Plaintiff & the Ohio Subclass)***

386.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

387.    Ohio Rev. Code Ann. § 1345.01 *et seq*. prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of Ohio.

388.    By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of Ohio Rev. Code Ann. § 1345.02. Defendant's conduct alleged herein is a "consumer transaction" within the meaning of Ohio Rev. Code Ann. § 1345.01, and the deception occurred within the state of Ohio.

389.    Plaintiff and other members of the Ohio Subclass used Defendant's Website from Ohio. Their Private Information was collected and transmitted by operation of the Pixels, which was instantiated in the Source Code running in their browser or mobile application.

390.    Defendant solicited, obtained, and stored Plaintiff's and Class Members' Private Information and knew or should have known not to disclose such Private Information to Meta and Google through use of the Pixels and other tracking technologies.

391.    Plaintiff and Class Members would not have provided their Private Information if they had been told or knew that Defendant would be disclosing such information to Meta and Google.

392. As alleged herein, Defendant engaged in the unfair or deceptive acts or practices in the conduct of consumer transactions in violation of Ohio Rev. Code Ann. § 1345.02, including but not limited to:

393. Representing that its services were of a particular standard or quality that it knew or should have known were of another;

394. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure;

395. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Private Information, including duties imposed by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTCA"), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data, and HIPAA. Defendant's failure was a direct and proximate cause of the unauthorized disclosure of Plaintiff's and Class Members' Private Information;

396. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class Members' Private Information from unauthorized disclosure;

397. Omitting, suppressing, and concealing the material fact that it did not intend to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure; and

398. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Personal Information, including duties imposed by the FTCA and HIPAA, which failure was a direct and proximate cause of the unauthorized disclosure.

399. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

400. Such acts by Defendant are and were deceptive acts or practices which are and/or were likely to mislead a reasonable consumer by providing his or her Private Information to Defendant. Said deceptive acts and practices are material. The requests for and use of such Private Information in

Ohio through deceptive means were consumer-oriented acts and thereby falls under the Ohio Consumer Sales Practices Act.

401.    In addition, Defendant's failure to secure patients' Private Information violated the FTCA and therefore violated the Ohio Consumer Sales Practices Act.

402.    Defendant knew or should have known that its computer systems and data security practices—in particular, its use of the Pixels and Conversions API—were inadequate to safeguard the PII of Plaintiff and Class Members, and that enabling third parties to collect the Private Information of Plaintiff and the Ohio Subclass constituted a data breach. Plaintiff and Class Members accordingly seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, injunctive relief, civil penalties, and attorneys' fees and costs.

403.    Defendant's violations of the Ohio Consumer Sales Practices Act have an impact and general importance to the public, including the people of this state. Thousands of Ohio citizens have had their Private Information transmitted without consent from Defendant's Website to third parties.

404.    As a direct and proximate result of these deceptive trade practices, Plaintiff and Class Members are entitled to judgment under the Ohio Consumer Sales Practices Act, to enjoin further violations, to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

405.    Defendant's implied and express representations that it would adequately safeguard Plaintiff's and Class Members' Private Information constitute representations as to the particular standard, quality, or grade of services that such services did not actually have (as the services were of another, inferior quality), in violation of the Ohio Consumer Sales Practices Act.

406.    Accordingly, Plaintiff, on behalf of herself and Class Members, brings this action under Ohio Rev. Code Ann. § 1345.01 to seek such injunctive relief necessary to enjoin further violations and recover costs of this action, including reasonable attorneys' fees and other costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of herself and the Proposed Classes defined herein, respectfully request:

A.  That this Action be maintained as a Class Action, that Plaintiff be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and that notice of this Action be given to Class Members;

B.  That the Court enter an order:

    a.  Preventing Defendant from sharing Plaintiff's and Class Members' Private Information among other third parties;

    b.  Requiring Defendant to alert and/or otherwise notify all users of its websites and portals of what information is being collected, used, and shared;

    c.  Requiring Defendant to provide clear information regarding its practices concerning data collection from the users/patients of Defendant's Web Properties, as well as uses of such data;

    d.  Requiring Defendant to establish protocols intended to remove all personal information which has been leaked to Facebook and/or other third parties, and request Facebook/third parties to remove such information;

    e.  Requiring Defendant to provide an opt out procedures for individuals who do not wish for their information to be tracked while interacting with Defendant's Web Properties;

    f.  Mandating the proper notice be sent to all affected individuals, and posted publicly;

    g.  Requiring Defendant to delete, destroy, and purge the Private Information of Users unless Defendant can provide reasonable justification for the retention and use of such information when weighed against the privacy interests of Users;

    h.  Requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted.

C.   That the Court award Plaintiff and the Class Members damages (both actual damages for economic and non-economic harm and statutory damages) in an amount to be determined at trial;

D.   That the Court issue appropriate equitable and any other relief (including monetary damages, restitution, and/or disgorgement) against Defendant to which Plaintiff and the Class are entitled, including but not limited to restitution and an Order requiring Defendant to cooperate and financially support civil and/or criminal asset recovery efforts;

E.   Plaintiff and the Class be awarded with pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

F.   Plaintiff and the Class be awarded with the reasonable attorneys' fees and costs of suit incurred by their attorneys;

G.   Plaintiff and the Class be awarded with treble and/or punitive damages insofar as they are allowed by applicable laws; and

H.   Any and all other such relief as the Court may deem just and proper under the circumstances.

## **JURY TRIAL DEMANDED**

Plaintiff demands a jury trial on all triable issues.

Dated: April 8, 2024                          Respectfully submitted,

                                              /s/ John R. Parker
                                              John R. Parker, Jr. (SBN 257761)
                                              jrparker@almeidalawgroup.com
                                              **ALMEIDA LAW GROUP LLC**
                                              3550 Watt Avenue, Suite 140
                                              Sacramento, California 95608
                                              Tel: (916) 616-2936


                                              **MIGLIACCIO & RATHOD, LLP**
                                              Nicholas A. Migliaccio
                                              Jason S. Rathod
                                              Bryan G. Faubus

Tel: 202.470.3520
nmigliaccio@classlawdc.com*
jrathod@classlawdc.com*
bfaubus@classlawdc.com*
(* *pro hac vice anticipated*)

***Attorneys for Plaintiff & the Putative Classes***